[Civ. No. 62162. Second Dist., Div. One. Oct. 27, 1983.]

DIANE HILLIARD, Plaintiff and Appellant, v.
A. H. ROBINS COMPANY, Defendant and Appellant.

378

**COUNSEL**

Conklin, Davids & Friedman, Dennis B. Conklin and Jay R. Mayhall for Plaintiff and Appellant.

Haight, Dickson, Brown & Bonesteel, Robert L. Dickson, Roy G. Weatherup, Jerry M. Custis, Bronson, Bronson & McKinnon, Paul H. Cyril, Elliot L. Bien, Stephen C. Tausz and Barbara J. Paulson for Defendant and Appellant.

## OPINION

## FAINER, J.*—

### 1. INTRODUCTION[1]

Plaintiff Hilliard appeals from the judgment rendered after the trial court granted a directed verdict in favor of defendant Robins on the bifurcated issue of punitive damages. Plaintiff also contends that the trial court erred in granting nonsuits as to her fraud claims and in excluding certain evidence. Defendant Robins cross-appeals from the judgment on special verdict for $600,000 general damages in favor of plaintiff and against Robins only, asserting that the case was not brought to trial within the five-year mandatory time limit of Code of Civil Procedure section 583, subdivision (b), that the amount of general or compensatory damages was excessive, that the evidence was insufficient to support the judgment for compensatory damages, and that the trial court committed reversible errors in instructing the jury, in failing to grant a mistrial because of prejudicial misconduct by plaintiff's lawyer and/or because the jury was subjected to prejudicial media publicity, and, finally in receiving inadmissible prejudicial evidence over Robins' objections.

Defendant Robins has included in its grounds for appeal, the denial of its motion for new trial. An order denying a motion for a new trial, however, is nonappealable. (*Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744, 748-749 [137 Cal.Rptr. 417].) Our review of the record reveals that defendant raises the same or substantially similar issues on appeal as it advanced in its motion for new trial. To the extent that the issues contained in Robins' new trial motion are argued on appeal, we consider them.

The judgment on special verdict does not mention the order granting the directed verdict on the punitive damage issue. ■ An order directing a verdict is nonappealable. (*Surabian* v. *Lorenz* (1964) 229 Cal.App.2d 462, 463 [40 Cal.Rptr. 410].) Ordinarily, an appeal from the judgment permits a review of the order granting a directed verdict. (See *Costa* v. *Regents of University of Cal.* (1951) 103 Cal.App.2d 491, 495 [229 P.2d 867].) In the case at bar, however, the judgment failed to mention the directed verdict nor did the clerk enter judgment of the directed verdict. A dismissal of the appeal on the directed verdict issue might be appropriate, with the trial judge instructed to amend the judgment to include a disposition of the punitive damage issue based on the directed verdict. This procedure would result in a waste of judicial resources and would require rebriefing. The

---

*Assigned by the Chairperson of the Judicial Council.

[1]As both plaintiff Hilliard and defendant Robins have appealed, we refer to them as plaintiff and defendant.

trial court intended a final ruling. "In the interests of justice and to prevent unnecessary delay, we order the judgment . . ." to be amended by adding a paragraph directing verdict in favor of defendant Robins on the bifurcated issue of punitive damages. (*Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 524 [322 P.2d 933]; see 6 Witkin, California Procedure (2d ed. 1971) Appeals, § 49, pp. 4064-4065.) We perceive no prejudice to either party in preserving the appeal of plaintiff Hilliard on the punitive damage issue by this routinely accepted procedure (*Tenhet* v. *Boswell* (1976) 18 Cal.3d 150, 154-155 [133 Cal.Rptr. 10, 554 P.2d 330]) and we review the punitive damage issue on the merits as an appeal from the judgment as amended.

The trial court granted the nonsuit motions of defendant Robins as to plaintiff's fraud claims, counts 4 and 7. As this order disposed of some but not all of the issues involved in the trial, Code of Civil Procedure section 581c, subdivision (b) requires no judgment be entered on the nonsuited fraud counts prior to the termination of the action and then the judgment, in addition to the matters determined in the trial, include the judgment for nonsuit. As the judgment in our instant case made no mention of the non-suited counts, we amend the judgment to add a paragraph nonsuiting plaintiff on her fraud claims, counts 4 and 7, against defendant Robins. Plaintiff's contention on appeal that the trial court erred in granting the nonsuits is therefore an appeal from the judgment as amended.

## 2. PROCEDURAL BACKGROUND

Plaintiff filed her original complaint on November 25, 1974, against defendant Robins, three doctors, and a hospital. The matter was tried on plaintiff's sixth amended complaint. Defendant Robins was alleged to be liable for plaintiff's injuries for negligence (count 1), strict liability (count 2), breach of express warranty (count 3), fraud (counts 4 and 7),[2] wilful and wanton misconduct (count 5), which was apparently plaintiff's pleading basis for punitive damages, and civil conspiracy (count 6). As to defendant doctors Baker, Brown and Smith, plaintiff alleged their treatment of her amounted to medical malpractice in count 8 of the sixth amended complaint. Defendants Davis and Lerner, inventors of the Dalkon Shield, the intra-uterine device (IUD) inserted in plaintiff for use as a contraceptive, were also charged with negligence in count 1. The medical malpractice claims against defendant doctors Baker, Brown and Smith (count 8) and the civil conspiracy (count 6) were dismissed. The trial court granted motions for nonsuit as to the fraud claims (counts 4 and 7).

---

[2]The fraud cause of action in count 4 was based on alleged misrepresentations by defendant Robins in labeling and promoting the product. The other fraud claim, count 7, was based on alleged false representation in compiling research statistics.

The case against defendants Lerner and Davis went to the jury only on the issue of negligence. After evidence on all issues had been presented and all parties had rested, the trial court allowed the case to go to the jury on plaintiff's causes of action for negligence, strict liability and breach of express warranty, against defendant Robins but ordered the plaintiff's claims for punitive damages against Robins bifurcated, ruling that this claim would not go to the jury unless it returned a verdict on the issue of liability and general damages against defendant Robins.

The jury, after a nineteen-week trial and six days of deliberation, returned a nine to three general verdict against Robins for $600,000 general damages, exonerating the other defendants and, on a special verdict, found plaintiff did not contribute to her injuries. Defendant Robins then moved for a directed verdict on the bifurcated punitive damage issue. The motion was granted. Judgment on the verdict was entered and after the new trial motions of both plaintiff and defendant Robins were denied, these appeals followed.

### 3. Factual Background

On June 24, 1972, approximately seven weeks after giving birth to her second child, plaintiff had inserted into her uterus a Dalkon Shield, an intrauterine device, as a contraceptive. The Dalkon Shield IUD was manufactured and marketed by defendant Robins. The defendant sold the Shields only to doctors and not to the public, since the insertion of the device required medical expertise and equipment. Dr. Dekle, plaintiff's doctor who also placed the Dalkon Shield into her, testified he relied on sales promotion efforts of defendant Robins as well as his own experience in making his recommendations and in his continuing to use the device.

The Dalkon Shield is a small plastic device with a thin translucent plastic membrane sheet attached to a plastic outer rim or perimeter. This rim is serrated with fins or barbs on each side folded slightly backwards to hold the device in place in the uterine cavity preventing its involuntary expulsion. A black nylon string approximately four inches long is attached through an opening or hole in the device. When the Dalkon Shield is in place in the uterus, the string extends through the cervical canal and allows the physician or patient, by palpation, to know that the device is in place or to remove it by pulling on the string.

The Dalkon Shield was developed by defendants Davis and Lerner. These defendants began a limited marketing venture of the device through a small company called the Dalkon Corporation. Defendant Davis published the results of testing the device for approximately one year on 640 Dalkon Shield insertions in the American Journal of Obstetrics and Gynecology in

1970. Defendant Robins purchased the Dalkon Shield in June 1970, and made several design changes in the product reducing its width, thinning the membrane sheet, thickening the tail or pull-tie area, rounding the fins or barbs and adding copper salt to the plastic base.[3] The modified product was not tested before marketing by defendant Robins and the advertising promotional material referred to the Davis published test results on the unmodified product.

Defendant Robins began marketing the product in January 1971. During the time before the Shield was placed in plaintiff, defendant Robins received numerous complaints from doctors that the product was causing pelvic inflammatory disease. These reports continued up to and after the device was removed from plaintiff on May 8, 1974.

In February and in June 1973, Dr. Baker[4] gave plaintiff a pelvic examination and saw the IUD string in the cervical opening, which meant it was in place. Plaintiff did complain of uterine spotting, cramps, pressure in her "public" [sic] region, and general fatigue. In December 1973, Dr. Baker found plaintiff to be pregnant and he found no IUD string at that time. He told her he did not know if she had lost it through expulsion or "where it is." Apprehensive that the Dalkon Shield was still inside "her body", she elected to terminate the pregnancy by a therapeutic abortion. Dr. Baker referred plaintiff to a planned parenthood clinic and gave her a note to give to the clinic stating that she had had a Dalkon Shield IUD but as no string was "apparent, please determine this." A Dr. Brown performed the abortion on December 18, 1973. He did not recall receiving the note from Dr. Baker but testified that if he had he would have taken extra care to see if there was an IUD in plaintiff's uterus. He found no IUD string or IUD. After the abortion, he inserted into plaintiff another intrauterine device, a Lippes Loop.

Four months later, on April 18, 1974, Dr. Baker removed the Lippes Loop IUD after plaintiff complained of spotting, cramping and pain. When he pulled out the Lippes Loop by its string, he saw a second string. He tugged on the second string but it did not budge. At this time, Dr. Baker felt that there was an IUD still attached to the string but he did not know where it was. He decided to and did wait a week to see if the removal of the Lippes Loop would end plaintiff's problem. A week later, the bleeding

---

[3]Evidence was presented to the jury that the copper salt caused copper to be leached into the uterus making the device a more effective contraceptive. Defendant Robins, however, told the federal Food and Drug Administration that it was not claiming the copper leaching as a contraceptive property of the product.

[4]Plaintiff had moved to Los Angeles County from Georgia after the Dalkon Shield was inserted and she began seeing Dr. Baker in 1973.

had stopped but the plaintiff continued to have pain. Dr. Baker took X-rays on April 18, 1974, but they were apparently of poor quality and did not reveal the presence of an IUD. The doctor testified that at that time he did not know that the Dalkon Shield required special X-ray techniques to discover its presence and location.

Dr. Baker sent plaintiff to the St. Joseph Medical Center for X-rays on April 26, 1974. The radiologist, Dr. Taber, was not aware of any special technique needed to visualize a non-metallic IUD on X-rays but merely reported no "evidence of a metallic IUD" in plaintiff's pelvis. A week later, on May 2, 1974, a gynecologist, Dr. Smith, examined plaintiff, diagnosing a chronic pelvic inflammatory disease. He treated plaintiff with large injections of penicillin and antibiotics. On May 4th, plaintiff was seen in the emergency room, vomiting, feeling "really sick" and experiencing severe abdominal pain. X-rays "suggested the possibility" of a contraceptive device not in the "usual position."

On May 8, 1974, a Dr. Hariton, with a Dr. Baum, performed a D & C (dilation and curettage) finding a blue-black string but with no IUD attached. The doctors then performed a laparotomy (to explore plaintiff's abdominal cavity). They found a large abscess, filled with pus, behind plaintiff's uterus in the area of her sigmoid colon. Protruding from the center of the abscess was the Dalkon Shield. The doctors also removed plaintiff's right fallopian tube, which was inflamed, and part of her right ovary. The surgeons found multiple adhesions to plaintiff's sigmoid colon. Plaintiff's uterus was not removed because she wanted more children, even though the Shield had punctured her uterus posterior wall.

Over the next two years, plaintiff had six further major abdominal surgeries to correct adhesions between her vagina and rectum, to repair a rectovaginal fistula and to remove the remaining portion of her right ovary. In one of these surgeries it was necessary for plaintiff to have a colostomy which is a temporary creation of a new opening of the colon on the surface of the body with an attached bag for the collection of fecal matter. The colostomy was in place three months. In February 1979, approximately sixteen months after her last operation, plaintiff discovered she was ten weeks pregnant. Plaintiff feared she would give birth to a defective child because of pain and bleeding and because of her past surgical experience. This strong feeling continued despite her doctor's assurance that there were no signs of an abnormal fetus. She elected to abort and undergo hysterectomy. This was done in March 1979. The fetus did not appear abnormal.

## 4. THIS CASE WAS BROUGHT TO TRIAL WITHIN FIVE YEARS

■ In its cross-appeal, defendant Robins contends the case was not brought to trial within the mandatory five-year time limit prescribed by Code of Civil Procedure section 583, subdivision (b).[5] We reject this contention.

The complaint was filed on November 25, 1974. The five-year time limit expired on November 26, 1979, as November 25 was a Sunday. (Code Civ. Proc., § 12.) The cause was transferred to the trial court on October 31, 1979, twenty-six days before the expiration of the five-year period. After an unnecessarily long series of pretrial motions including pleading disputes raised by defendants, the jury selection process commenced. The jury venire panel was sworn[6] and voir dire examination of prospective jurors began on November 20, 1979. The jury selection process continued to November 27, 1979, when defendant Robins moved to dismiss for failure to bring the case to trial within the five year period ending November 26. The trial court denied Robins' motion based upon an assertion that the time limitation prescribed by section 583, subdivision (b), had expired. Robins argued that the case had not been "brought to trial," because jurors who would actually try the case had not been sworn as required by Code of Civil Procedure section 604.

The trial court's ruling was correct.

In order to determine whether the time limits of Code of Civil Procedure section 583, subdivision (b) have been tolled prior to the expiration of the limitation period, it is necessary to define the term "brought to trial," as used in that section. California appellate courts have said that a case is brought to trial ". . . when the parties commence the examination of prospective jurors and [upon] the impanelment of the jury, . . ." (*Kadota* v. *City & County of S.F.* (1958) 166 Cal.App.2d 194, 195 [333 P.2d 75]) because ". . . impaneling of a jury is part of the trial. . . ." (*Silcox* v. *Lang* (1889) 78 Cal. 118, 124 [20 P. 297].)

---

[5]Code of Civil Procedure section 583, subdivision (b) provides as follows:
"Any action heretofore or hereafter commenced shall be dismissed by the court in which the same shall have been commenced or to which it may be transferred on motion of the defendant, after due notice to plaintiff or by the court upon its own motion, unless such action is brought to trial within five years after the plaintiff has filed his action, except where the parties have filed a stipulation in writing that the time may be extended."

[6]When the jury venire panel arrives in the courtroom and court is convened, the trial clerk administers an oath to the entire panel. (See Code Civ. Proc., §§ 246, 247; Cal. Judges Benchbook, Civil Trials (CJER 1981) § 4.10.)

In *Hartman* v. *Santamarina* (1982) 30 Cal.3d 762, 765 [180 Cal.Rptr. 337, 639 P.2d 979], the California Supreme Court discussed some procedures for bringing a jury case and a nonjury case to trial under the so-called "five-year statute." In a footnote, the court referred to *Kadota* without disapproval and noted "[t]he opinion's statement of the issue, . . . , implies that a jury case is brought to trial 'when the parties commence the examination of prospective jurors.'" (*Id.,* at p. 765, fn. 3.) In view of *Kadota* and the Supreme Court's recent citation thereof, we can only conclude that a party can put a jury trial beyond the bar of section 583, subdivision (b) by commencing the jury selection process. A contrary result would invite an unscrupulous party to delay or prolong voir dire examination of prospective jurors until the expiration of the five-year period.

We note, in addition, defendant Robins' implicit understanding of the rule of law supporting our conclusion, for after the trial jury was sworn, Robins' lawyer stated to the court ". . . I am going to, for the record, withdraw my motion to dismiss under 583b. I think the law is clear that the trial started." Defendant's statement demonstrates its acquiescence to the fact that plaintiff had satisfied the five-year limitation and the trial court's ruling was correct. (*Hill* v. *Estate of Westbrook* (1952) 39 Cal.2d 458, 461 [247 P.2d 19]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 273, pp. 4261-4262.)

### 5. ORDER GRANTING MOTION FOR DIRECTED VERDICT ON PUNITIVE DAMAGES IS REVERSED

Plaintiff Hilliard contends that the trial court erred in granting defendant Robins' motion for a directed verdict on punitive damages. We agree.

After the jury had returned a general verdict for $600,000 compensatory damages in favor of plaintiff and against defendant Robins, the trial court granted defendant's motion for a directed verdict. In our discussion of this contention we must first deal with whether plaintiff made punitive damages an issue in her case and if so, was it properly isolated so that the jury was to consider it only after returning a verdict of liability and general damages.

Plaintiff did not seek punitive damages as part of her causes of action for negligence, strict liability, and breach of warranty. She purported to plead a separate "wilful and wanton misconduct" causes of action as a basis for her claim for punitive damages.

■ This was and is a difficult pleading for plaintiff to proceed to trial on the issue of punitive damages, for "wilful and wanton misconduct" does

not sufficiently allege malice as a basis of punitive damages when a non-deliberate injury, rather than an intentional wrong, is charged.[7]

█ There is no cause of action for punitive damages. Punitive or exemplary damages are remedies available to a party who can plead and prove the facts and circumstances set forth in Civil Code section 3294,[8] the cases interpreting this code section,[9] or by other statutory authority.[10] "Punitive damages are merely incident to a cause of action, and can never constitute the basis thereof. [Citations omitted.]" *Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 373, fn. 3 [122 Cal.Rptr. 732]. "The concurrence of both an actionable wrong and damages are necessary elements for a cause of action. Exemplary damages, where recoverable, are deemed to be " '. . . mere incidents to the cause of action and . . . [not] the basis thereof." ' [Citations.]" (*James* v. *Public Finance Corp.* (1975) 47 Cal.App.3d 995, 1000-1001 [121 Cal.Rptr. 670].) Plaintiff Hilliard

---

[7]See *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22 [122 Cal.Rptr. 218] for a discussion of the confusing history of the requirement to sufficiently plead malice as a ground for an award of punitive damages. "When nondeliberate injury is charged, allegations that the defendant's conduct was wrongful, wilful, wanton, reckless or unlawful do not support a claim for exemplary damages; such allegations do not charge malice. [Citations.]" (*Id.,* p. 29.)

[8]Civil Code section 3294 provides as follows:

"Exemplary damages; when allowable

"(a) In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

"(b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

"(c) As used in this section, the following definitions shall apply:

"(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others.

"(2) 'Oppression' means subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights.

"(3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

[9]E.g. *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 810 [174 Cal.Rptr. 348] ("Punitive damages . . . remain as the most effective remedy for consumer protection against defectively designed mass produced articles.")

[10]4 Witkin, Summary of California Law (8th ed. 1974) Torts, § 849, pp. 3142-3143.

should have pleaded the statutory language[11] in her negligence and strict liability causes of action plus sufficient facts (*Blegen* v. *Superior Court* (1981) 125 Cal.App.3d 959, 963 [178 Cal.Rptr. 470]) to support an allegation that defendant Robins acted in conscious disregard of the safety of others as this concept of malice is defined in such recent cases as *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894-896 [157 Cal.Rptr. 693, 598 P.2d 854]. It was suggested in *Taylor* v. *Superior Court, supra,* and in *Southern Pac. Transportation Co.* v. *State of California* (1981) 115 Cal.App.3d 116 [171 Cal.Rptr. 187], that the concept of wilful misconduct remains viable only to the extent that some forms of wilful misconduct such as intentional acts embody that degree of malice that provides a basis for recovering punitive damages. A separate wilful and wanton misconduct count is a tenuous, limited and probably improper cause of action to form a basis for a claim of punitive damages in those cases in which the damage claim is based on the conscious disregard concept of malice arising out of a nondeliberate act.

While the allegations of plaintiff Hilliard's complaint which are a basis of her punitive damages claim are questionable, we do not have to concern ourselves with the punitive damages pleading defects because the parties, during trial and in their briefs on appeal, and the trial judge considered this damage claim an issue properly raised and before the court on the conscious disregard concept of malice. ■ "Where the parties try the case on the assumption that . . . [an] issue . . . [is] raised by the pleadings, . . . neither party can change this theory for purposes of review on appeal." (6 Witkin, Cal. Proc. (2d ed.) Appeals § 281, p. 4269.) This is the doctrine of "the theory on which the case was tried" or "the theory of trial" and is a well established rule of appellate practice. (*Ibid.*) Neither party contends in their appeal that punitive damages were not an issue because of plaintiff's questionable pleadings.[12] We make the point now to emphasize that punitive damages were a proper issue during the trial and are in this appeal.

Satisfied that punitive damages are an issue in this case, we now examine the procedure used by the trial judge in separating, isolating or bifurcating plaintiff's punitive damage claim from the liability and general damage issues which were submitted to the jury.

Code of Civil Procedure section 598, at the time the case was brought to trial in November 1979, permitted the trial court to allow the trial ". . . of

---

[11]The sixth amended complaint was filed before the 1980 amendment to Civil Code section 3294 but the amendment merely codified existing law. (See *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 32 [122 Cal.Rptr. 218].)

[12]We do not consider the punitive damages claim which might flow from or be an incident to the fraud causes of action because the trial court was correct in granting nonsuits on these causes of action.

any issue or any part thereof . . . [to] precede the trial of any other issue or any part thereof in the case, except for special defenses which may be tried first pursuant to [Code of Civil Procedure] section 597." At the time this case was brought to trial in 1979, the court could not make a bifurcation order in a jury trial on its own motion. The code section was amended in 1979,[13] effective January 1, 1980, to provide, among other things, that ". . . [t]he court, on its own motion, may make such an order at any time." This amendment was in effect in 1980, at the time the trial court decided to send the case to the jury on the issue of liability and damages other than punitive damages, bifurcating the punitive damages issue against defendant Robins. The trial judge was therefore authorized to make a bifurcation order on his own motion.

██ There are no reported cases discussing the bifurcation of a punitive damage issue from the issue of the liability and compensatory damages. Such an order, however, is appropriate in those cases in which the trial judge, in his or her discretion, believes the ends of justice and ". . . the economy and efficiency of handling the litigation . . ."[14] will be promoted. In the case at bar, the trial judge appears to have entertained some doubts about his authority to isolate the punitive damages issue but he felt it was necessary because, at that time, he was somewhat skeptical and uncertain that the plaintiff had established a factual basis for punitive damages. The trial judge certainly had the authority under the amendments to the bifur-

---

[13]Code of Civil Procedure section 598, as amended, provides as follows:
"The court may, when the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted thereby, on motion of a party, after notice and hearing, make an order, no later than the close of pretrial conference in cases in which such pretrial conference is to be held, or, in other cases, no later than 30 days before the trial date, that the trial of any issue or any part thereof shall precede the trial of . . . any other issue or any part thereof in the case, except for special defenses which may be tried first pursuant to Sections 597 and 597.5. The court, on its own motion, may make such an order at any time. Where trial of the issue of liability as to all causes of action precedes the trial of other issues or parts thereof, and the decision of the court, or the verdict of the jury upon such issue so tried is in favor of any party on whom liability is sought to be imposed, judgment in favor of such party shall thereupon be entered and no trial of other issues in the action as against such party shall be had unless such judgment shall be reversed upon appeal or otherwise set aside or vacated.
"If the decision of the court, or the verdict of the jury upon the issue of liability so tried shall be against any party on whom liability is sought to be imposed, or if the decision of the court or the verdict of the jury upon any other issue or part thereof so tried does not result in a judgment being entered pursuant to this chapter, then the trial of the other issues or parts thereof shall thereafter be had at such time, and if a jury trial, before the same or other jury, as ordered by the court either upon its own motion or upon the motion of any party, and judgment shall be entered in the same manner and with the same effect as if all the issues in the case had been tried at one time."
The underlined portions represent the 1979 amendments. (Stats. 1979, ch. 216, § 3, p. 462; Stats. 1979, ch. 349, § 1, p. 1213.)
[14]See footnote 13.

cation code section and, under the circumstances, we cannot say that the bifurcation order was an abuse of discretion.

Punitive damages were proper issues in the negligence, strict liability and breach of warranty claims of plaintiff Hilliard and the order of bifurcation was not incorrect.

We turn now to the legal propriety of the trial court's order granting the motion of defendant Robins for a directed verdict on the punitive damages issue.

■ A motion for a directed verdict, like a motion for a nonsuit, is in the nature of a demurrer to the evidence. (*Hunt* v. *United Bank & Trust Co.* (1930) 210 Cal. 108, 117 [291 P. 184]; *Estate of Easton* (1931) 118 Cal.App. 659, 662 [5 P.2d 635].) The motion may be made by either party in a jury trial.[15]

After the jury returned its verdict of $600,000 against defendant Robins, said defendant renewed[16] its motion for a directed verdict on the punitive damage issue.[17] The motion was granted.[18]

This ruling appears to be based on the trial judge's belief that the evidence was not substantially sufficient to establish that defendant Robins was aware of the probable, as distinguished from the possible, dangerous consequences of its conduct in manufacturing and marketing the Dalkon Shield IUD.

---

[15]A directed verdict is not expressly authorized by statute but the motion is recognized in code sections dealing with motions for judgment notwithstanding the verdict (see Code Civ. Proc. §§ 629, 630), and its use is firmly established in California. (See, e.g., *Estate of Fleming* (1926) 199 Cal. 750, 752 [251 P. 637].)

[16]Defendant Robins had made the motion for a directed verdict before the jury was instructed and given the case for deliberation. It was at this time that the trial court made the bifurcation order.

[17]After the jury verdict was made a part of the record, the court, at the side bench outside the hearing of the jury, acknowledged that plaintiff's lawyer wanted to proceed on the issue of punitive damages against defendant Robins. The trial judge stated that plaintiff had such a right to proceed but that he, the judge, did not ". . . know at the moment what . . . [his] position would be for new trial regarding reduction of damages or a new trial in the event of the failure to agree such reduction in such case. . . ." The judge added that he thought the jury had ". . . been more than generous with . . ." plaintiff Hilliard. These reasons do not appear to be the trial judge's basis for granting the motion for a directed verdict. (See *Walker* v. *Northern San Diego County Hospital Dist.* (1982) 135 Cal.App.3d 896, 899 [185 Cal.Rptr. 617].) We assume these statements were made by the trial judge to persuade plaintiff not to insist on going forward with the punitive damage issue before the jury.

[18]The court actually stated it was granting the ". . . motion for a directed verdict on the question of wilful misconduct . . ." but, as the parties and the trial court treated the wilful misconduct claim as synonymous with plaintiff's punitive damage remedy claim, we do the same. (See *supra.*)

■ While punitive damages[19] may be recovered in a products liability case (*Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d 757, 808) and in a negligence action (*Taylor* v. *Superior Court, supra,* 24 Cal.3d 890), in order to justify an award of punitive damages on the basis of a conscious disregard of the safety of others, the plaintiff must establish that the defendant was aware of the *probable* dangerous consequences of its conduct and that it wilfully and deliberately failed to avoid those consequences. (*Taylor* v. *Superior Court, supra.*)

■ A directed verdict may be granted against a plaintiff ". . . 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, . . . indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] *Unless it can be said as a matter of law . . . no other reasonable conclusion is legally deductible from the evidence . . . the trial court is not justified in taking the case from the jury.*" (Italics added.) (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; accord, *Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360]; *Walker* v. *Northern San Diego County Hospital Dist., supra,* 135 Cal.App.3d 896, 899-900.)

■ The function of a trial court in ruling on a motion for a directed verdict is analogous to that of a reviewing court in determining on appeal whether there is evidence in the record of sufficient substance to support the verdict or judgment. *In considering the motion, the trial court may not weigh or consider conflicting evidence or judge the credibility of witness.* (*Estate of Lances, supra,* 216 Cal. 397, 401; *Free* v. *Furr* (1956) 140 Cal.App.2d 378, 382 [295 P.2d 134]; *Martin* v. *Vierra* (1939) 34 Cal.App.2d 86, 89 [93 P.2d 261].)

Reviewing courts have repeatedly reversed judgments on directed verdicts where the resisting party produced sufficient evidence to support a jury verdict in his or her favor. (*Dailey* v. *Los Angeles Unified Sch. Dist., supra,* 2 Cal.3d 741, 745; *Grimes* v. *Elite Ins. Co.* (1978) 82 Cal.App.3d 130, 136 [146 Cal.Rptr. 808].)

---

[19]In actions involving personal or physical injuries resulting from defective products made or sold by a defendant, the theory of strict liability in tort has largely superseded warranty liability. (*Grinnel* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 432 [79 Cal.Rptr. 369].) The reviewing court usually ignores the breach of warranty claim where product liability is shown. (See *Read* v. *Safeway Stores, Inc.* (1968) 264 Cal.App.2d 404, 406-407 [70 Cal.Rptr. 454].) For these reasons we do not consider the breach of warranty cause of action in our discussion of the order for a directed verdict on the punitive damage issue.

Plaintiff Hilliard had the burden of establishing that she suffered compensatory damages as a proximate result of the conduct of defendant Robins before she could be awarded punitive damages. (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801-802 [197 P.2d 713]; *Mother Cobb's Chicken T., Inc.* v. *Fox* (1937) 10 Cal.2d 203, 205-206 [73 P.2d 1185]; *Esparza* v. *Specht* (1976) 55 Cal.App.3d 1, 6 [127 Cal.Rptr. 493].) Plaintiff's claim for liability and compensatory damages went to the jury against defendant Robins on separate causes of action for negligence, for strict liability, and for breach of warranty. After the jury verdict against defendant Robins for $600,000 for general or compensatory damages, Robins' motion for new trial, including a claim that the award of damages was excessive and that the liability and damages issue were not supported by sufficient evidence, was denied. Plaintiff has clearly satisfied the requirement of liability and compensatory damages as a prerequisite for punitive damages.

The plaintiff presented substantial competent evidence during the trial, that the Dalkon Shield was both a negligently designed and marketed contraceptive product and a defective prophylate device on at least three separate factual bases which separately or together caused her injuries.

First, this plastic intrauterine device, with a serrated perimeter (causing the device to seek a high, optimum uterial fundal placement and to prevent involuntary expulsion) *migrated* and perforated through the wall or lining of plaintiff's uterus because of a perforation made at the time the device was originally inserted by Dr. Dekle or because of a perforation made by the Dalkon Shield during the time it was moving or migrating toward its optimum high fundal placement. It is not likely that the Shield was pushed through plaintiff's uterine wall when it was first inserted because the IUD string was visible to Dr. Baker seven months later, indicating it was in place in plaintiff's uterus.

Second, once the device was out of the plaintiff's uterus and somewhere else in plaintiff's pelvic cavity, it could not be readily discovered by physical means because the string was not to be found in plaintiff's cervical canal. The Dalkon Shield could not be discovered by ordinary X-ray techniques because of the *low level radiopacity* of the device.

Plastic IUD inserts cannot be visualized by X-ray unless they are impregnated with something to make them radiopaque. The most common substance used is barium sulfate. The Shield inserted in plaintiff Hilliard in 1972 contained a 10 percent solution of barium sulfate, which was inadequate because of the thinness of the membrane. It was difficult to see on X-ray film, especially if it was "on end." The defendant manufacturer did not

increase the barium sulfate levels of commercially marketed Dalkon Shields until 1973. The labeling, the warnings, the brochures, and other information distributed to the medical profession was inadequate to apprise the doctors of the risk. Neither Dr. Baker nor Dr. Taber knew of any special soft tissue X-ray techniques or instructions and if either of their X-rays had disclosed the presence of the device, it is possible that some of plaintiff's subsequent problems could have been avoided.

Third, the tail string attached to the Dalkon Shield extending through the cervical canal to the vagina was a major carrier of body fluids laden with bacteria from the vagina to the uterus and to other parts of the pelvic cavity if the IUD migrated or went through the walls of the uterus, as it did in the case of plaintiff Hilliard. The string was cut on each end and the ends were not sealed in any manner. The result was a *wicking* or capillary *action* of the body fluids from its bacteria exposed end in the vagina through the string to the sterile uterus or other sterile parts of the female pelvic area.

There was substantial evidence from which the jury could have found that defendant Robins' conduct in designing, manufacturing and in marketing this product was in conscious disregard of the rights and safety of others and ". . . that the defendant was aware of the probable dangerous consequences of . . . [its] conduct, and that . . . [it] wilfully and deliberately failed to avoid those consequences." (*Taylor* v. *Superior Court, supra,* 24 Cal.3d 890, 895-896; *G. D. Searle & Co.* v. *Superior Court, supra,* 49 Cal.App.3d 22.)

The substantial evidence so adduced showed Robins had reports from its own employees about the wicking hazard and had other significant information about infections caused by wicking. The substantial evidence showed that Robins elected to continue to market the device without any change to the string either in sealing its ends or in switching to a string whose properties would at least reduce the bacteria wicking effect. The substantial evidence showed that the Dalkon Shield often perforated the uterine wall and that it moved or migrated through perforations in the uterine wall or made its own punctures or holes as it migrated and sought a high fundal placement in the uterus.[20] The substantial evidence showed that the plastic IUD inserted into plaintiff was radiolucent and the medical profession, particularly the X-ray people, were given meager and rather inconspicuous information about this characteristic. The substantial evidence showed that defendant Robins knew of the X-ray problems and the grave consequential and omi-

---

[20]The angled fins or barbs in the rim of the plastic device were especially designed so that the Shield could not readily be involuntarily expelled from the uterus in the direction from which it was inserted.

nous dangers radiolucency posed and yet did practically nothing. The substantial evidence showed that Robins knew of a large number of cases of serious pelvic inflammatory disease, of perforations, spontaneous abortions and other serious complications associated with the use of Dalkon Shield.

The jury could have concluded from this substantial, competent, admissible, relevant evidence that all of the factual elements necessary for punitive damages were proved to their satisfaction by a preponderance of the evidence; that defendant acted with conscious disregard of the rights or safety of others, that it was aware of the probable dangerous consequences of its conduct, and that the defendant wilfully and deliberately failed to avoid these consequences. (See *Taylor, supra,* at pp. 894-897; *Searle, supra,* at p. 32.) The jury could have concluded that plaintiff was entitled to punitive damages. The trial court erred in granting the Robins' motion for a directed verdict.[21]

### 6. THE TRIAL COURT ERRED IN REJECTING EVIDENCE PROFFERED BY PLAINTIFF ON THE ISSUE OF PUNITIVE DAMAGES.

■ Trial court excluded evidence and reference to the fact that the Dalkon Shield caused septic abortions and deaths. The basis of the trial court ruling was that such evidence would be unduly prejudicial to defendants. (See Evid. Code, § 352.) The trial court ruled that evidence that defendant Robins had taken the Dalkon Shield off the United States market on June 28, 1974 was not relevant. The trial court also excluded evidence that Robins withdrew the Dalkon Shield from the domestic market in June 1974, under some pressure from the federal Food and Drug Administration (FDA). The trial court set an evidentiary cutoff date of May 1974 of Robins' activities with Dalkon Shield. This was the date the IUD was removed from plaintiff. These rulings prevented plaintiff from presenting evidence of Robins' subsequent activities in connection with her punitive damage claim. Finally, the trial court would not allow plaintiff to present evidence that the state of the art in testing medical devices such as an IUD required long term animal studies.

The evidence rulings were made during the trial while the punitive damage issue was still before the jury. The rulings were erroneous.

---

[21]This court neither accepts nor rejects the plaintiff's claim that the acts and conduct of the defendant manufacturer in connection with its claim of low pregnancy rate is a basis for the punitive damage remedy. We also recognize that plaintiff presented substantial evidence of a conscious decision by defendant Robins not to test the IUD device prior to or during marketing. We do not reject this conduct by defendant as a basis for an award of punitive damages to plaintiff.

The excluded evidence was in each situation relevant. (Evid. Code, § 210.) Evidence of death and septic abortions caused to Dalkon Shield users is relevant because it had a tendency in reason to prove that defendant was aware of the probable dangerous consequences of their plastic IUD. Evidence that defendant Robins took the Dalkon Shield off the domestic market as the result of some pressure or activity by the FDA[22] in June 1974 is relevant if Robins was aware of the reasons of the FDA in seeking the removal of this device from the market because this evidence has a tendency in reason to prove that Robins, aware of the probable dangerous consequences of the product, wilfully and deliberately failed to avoid those consequences until pressured by the FDA. Evidence of any conduct by defendant, in continuing to manufacture and market the Dalkon Shield without change, in the United States, or elsewhere, aware of the probable dangerous consequences of the IUD, is evidence having a tendency in reason to prove Robins wilfully and deliberately failed to avoid these consequences. Evidence that Robins failed to adequately test the Dalkon Shield before marketing it or during marketing is evidence that Robins acted with conscious disregard for the safety of others. Evidence that Robins, aware of the state of the art in testing medical devices on animals, failed to conduct adequate animal testing is evidence that has a tendency in reason to prove that Robins acted in conscious disregard of the safety of others.

Relevant, admissible, competent evidence is subject to being excluded for policy reasons distinct from probative value. Evidence Code section 352 states the policy as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or misleading the jury."

The three policy factors of undue prejudice, confusion of the issues, and misleading the jury are practically the same and are the only ones we consider as undue consumption of time did not seem to be a problem in the 19-week trial we are reviewing. ▇▇ ▇▇▇▇ The trial judge excluded

---

[22]Reported federal cases involving Dalkon Shield injury disputes against Robins state that Robins withdrew this IUD from the United States market in June 1974, under some pressure from the FDA. (See *In re Northern Dist. of Cal., Dalkon Shield, etc.* (9th Cir. 1982) 693 F.2d 847, 848; *Sydney-Vinstein* v. *A.H. Robins Co.* (9th Cir. 1983) 697 F.2d 880, 882.) At the time Robins purchased the device in 1970, and at the time they took the device off the market, the FDA had no regulations in effect governing IUDs as contraceptives. The FDA has regulated IUDs since 1976.

some of the disputed evidence because of its prejudicial effect.[23] ■ The trial court abused its discretion in making such ruling. All of the evidence has strong probative value to show malice of defendant Robins under the conscious disregard concept which is the main factor for the jury to consider in awarding punitive damages. (See *Kessler* v. *Gray* (1978) 77 Cal.App.3d 284, 291 [143 Cal.Rptr. 496], in which the reviewing court states that the trial court, in utilizing the balancing process discussed below, must consider ". . . the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relevant *to the main or only a collateral issue,* and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion. [Citation.]") (Italics added.) Most evidence is prejudicial to the party against whom the evidence is offered. The exclusion of evidence requires a balancing or weighing of the probative value of the disputed evidence against the policy factors. To exclude the proffered evidence, the trial judge must have gone through this balancing process and found that the probative value of the evidence was outweighed by the probability that its admission would create a substantial danger of undue prejudice against defendant Robins. (*Ibid.*) As already pointed out the malice or conscious disregard concept was and is a main issue in the punitive damage part of plaintiff's case and the rejected or excluded evidence permitted a strong, a powerful inference of the existence of elements of the conscious disregard concept of malice. (See *People* v. *Jentry* (1977) 69 Cal.App.3d 615, 627 [138 Cal.Rptr. 250].) The evidence was cumulative but necessary to plaintiff's burden of proof because evidence of the repeated instances of this conduct by Robins is evidence of Robins' conscious disregard of the safety of others, Robins' awareness of the probable dangerous consequences of its conduct and its Dalkon Shield, and Robins' wilful and deliberate failure to avoid said consequences. Exclusion under Evidence Code section 352 was or would be an abuse of discretion because the prejudice to defendant Robins is substantially outweighed by the probative value of the evidence on the issue of malice.

■ Finally, we consider whether the evidence of conduct or activities of defendant Robins in manufacturing and marketing the Dalkon Shield subsequent to the IUD being placed in plaintiff, subsequent to the IUD being removed from plaintiff, and subsequent to the IUD being removed from the domestic market is admissible. We hold that it is admissible on the issues

---

[23]The trial court's reason that evidence of septic abortions and deaths "were prejudicial" is probably an inadequate record as a basis for a ruling under Evidence Code section 352. "If the judge excludes relevant evidence, he should indicate on the record that he *finds* that the probative value of the evidence is substantially outweighed by the danger of undue prejudice to the opponent, . . ." (Jefferson, California Evidence Benchbook (Cont.Ed.Bar 1972) Discretion to Exclude Revelant Evidence—In General, § 22.1, p. 289.) Making such a record reflecting the trial court's exercise of discretion under Evidence Code section 352 is mandated by *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468].

of malice and punitive damages. Proffered evidence which deals with events occurring after a plaintiff had last used the product is generally inadmissible. On the issue of malice and punitive damages, however, the plaintiff may present any evidence which would tend to prove the essential factors of the conscious disregard concept of malice. This includes evidence of subsequent activities and conduct of defendant Robins. (*Blank* v. *Coffin* (1942) 20 Cal.2d 457, 463 [126 P.2d 868].)

In proving that defendant Robins acted in conscious disregard of the safety of others, plaintiff Hilliard was not limited to Robins' conduct and activities that directly caused her injuries. The conscious disregard concept of malice does not limit an inquiry into the effect of the conduct and activities of the defendant on the plaintiff, the inquiry is directed at and is concerned with defendant's conduct affecting the safety of others. Any evidence that directly or indirectly shows or permits an inference that defendant acted with conscious disregard of the safety or rights of others, that defendant was aware of the probable dangerous consequence of defendant's conduct and/or that defendant wilfully and deliberately failed to avoid these consequences is relevant evidence. Such evidence includes subsequent conduct unless such subsequent conduct is excluded on policy consideration.

Evidence Code section 1151 makes evidence of subsequent repairs inadmissible to establish prior negligence or other culpable conduct. This statutory exclusion of evidence rule is based on a public policy consideration that the exclusion of such evidence encourages persons to take subsequent precaution for the purpose of promoting and encouraging safety, without fear of having such conduct used to establish liability. (Law Revision Com. com., Evid. Code, § 1151; Jefferson, California Evidence Benchbook (Cont.Ed.Bar 1972) Evidence of Subsequent Repairs or Other Subsequent Remedial Conduct, § 34.2.)

The policy purpose of Evidence Code section 1151 is to exclude evidence of affirmative remedial or precautionary conduct. The policy consideration was not to exclude evidence of the failure to make changes in a defective product or the failure to withdraw a dangerous product from the market. Admitting evidence of no product change or of no withdrawal from the market, on the issue of punitive damages, is consistent with the public policy consideration of Evidence Code section 1151. Failure to make changes in a known defective product, failure to remove such a product from the market does not promote public safety.

Such conduct is contrary to any policy aimed at promoting or encouraging public safety. Such conduct is admissible evidence on the punitive damage issue in order to provide meaningful consumer protection against the man-

ufacture and distribution of dangerous, defective products. "Punitive damages . . . remain as the most effective remedy of consumer protection against defectively designed mass produced articles. They provide a motive for private individuals to enforce rules of law and enable them to recoup the expense of doing so. . . ." (*Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d 757, 810.)

The excluded evidence was admissible on the issue of punitive damages. It is not necessary to consider the question of whether evidence was also admissible on the issues of liability or compensatory damage as we affirm the award of compensatory damages.[24] We discuss the admissibility of evidence of subsequent conduct of Robins in failing to change the Dalkon Shield or remove it from the market after it was placed in plaintiff and after it was removed from plaintiff because this is evidence that will be proffered in the retrial of the punitive damages.

### 7. The Trial Court Committed No Reversible Error as to Contentions Raised by Defendant Robins in Its Cross-Appeal

We now consider the numerous claims of error asserted by defendant Robins in its cross-appeal.

### a. The Trial Court Refusal to Give Defendant's Instruction Number Four Was Not Reversible Error.

In essence defendant Robins is asserting that the jury should have been instructed that proper directions and warnings would have rendered the Dalkon Shield nondefective.[25] This was defendant's instruction number four which was refused by the trial court. The jury was instructed in substance that an unavoidably unsafe drug or medical device is not defective if properly prepared and accompanied by proper warning. This was defendant's instruction number three which was given.

The jury must be given instructions pertaining to the particular facts of the case tried. (*Borenkraut* v. *Whitten* (1961) 56 Cal.2d 538, 545-546

---

[24]In *Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986], it was held that Evidence Code section 1151 was not a bar to the admissibility of evidence that a manufacturer made a subsequent change in a defective product following an accident in a strict liability case. Evidence of Robins' failure to correct or change the defective IUD or to remove it from the market does not have a tendency in reason to prove the product was defective when it was placed in plaintiff. Such evidence was not relevant on the liability issues of the case at bar.

[25]The disputed instruction not given does not say to whom the proper directions and warnings were or are to be given. We assume they were to be given to the doctors who inserted the IUD device and monitored it while in a patient. (See *infra.*)

[15 Cal.Rptr. 635, 364 P.2d 467].) A party should not be required to rely on abstract generalizations in presenting its theory of the case. The jury should be instructed on all vital issues. (*Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 10 [116 Cal.Rptr. 575].) In the field of products liability, it is reversible error for the trial court to fail to instruct on a specific definition of "defect." (*Titus* v. *Bethlehem Steel Corp.* (1979) 91 Cal.App.3d 372 [154 Cal.Rptr. 122].)

 Although defendant's argument is that the trial court failed to adequately instruct on the relationship between a product being "not defective" and "proper warnings", we hold that the jury was so instructed and defendant's assertion of error in instruction is without merit. Both the given instruction (number three) and the rejected one (number four) discuss risk justification with new drugs and medical products and both tell the jury that a warning may negate a defect.

Defendant maintains in its appellate brief that the jury was not adequately advised that proper warnings to physician could render a product nondefective and safe. As the rejected jury instruction does not mention to whom the warning is to be given and the jury instruction given clearly advised the jury of just that, this argument is totally devoid of merit. It is hornbook law that the trial court may reject proffered jury instructions where portions thereof (e.g. warnings) correctly stating the applicable law are covered by other instructions given. (*Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 986 [95 Cal.Rptr. 381].)

Finally, defendant insists that both instructions should have been given because the rejected one addresses the defense to product liability and the one given is for the defense of breach of warranty. Robins relies on *Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379 [482 P.2d 681, 52 A.L.R.3d 92] which holds that a party is entitled to jury instructions on all legal theories proffered. Defendant's reliance on *Jiminez* is misplaced and this contention is rejected. In *Jiminez,* the jury was instructed on strict liability but not on negligence and res ipsa loquitur. The jury returned a verdict for defendant, and defendant appealed the trial court's order granting plaintiff a new trial. In affirming the new trial order, the *Jiminez* court said that while plaintiff, in a strict liability case, only had to ". . . prove that he was injured by a defect in the product and that the product was defective when it left the hands of the retailer or manufacturer, . . . to recover in negligence the plaintiff must prove the same two elements plus an additional element, namely, that the defect in the product was due to negligence of the defendant." (*Id.*, at p. 383.) It was then pointed out that while it ordinarily would seem simpler for a plaintiff to prove strict liability than negligence, the negligence and res ipsa loquitur instructions would be better for plaintiff

*Jiminez* because the jury instructed ". . . on traditional negligence principles might well conclude that . . . [the product had] . . . become . . . dangerous after minimal use by plaintiff . . . [and this] involved an unreasonable risk of bodily harm." (*Id.*, at p. 384.) Further, instruction on the doctrine of res ipsa loquitur might have been helpful to the plaintiff because he would not have to identify the particular defect. (*Id.*, at p. 385.) These are far different results than those in our instant case. Here, the trial court refused to instruct about warnings and justifiable risks twice where the rejected instruction and the given instruction tell the jury precisely the same thing. Defendant Robins' given instruction addresses itself as much to the issue of strict liability as does the rejected one. Both instructions seem to be based on *Carmichael* v. *Reitz, supra,* 17 Cal.App.3d 958 and the Restatement of Torts, Second, section 402 A, which specifically deal with strict liability as distinguished from negligence or breach of warranty. Neither the given instruction nor the rejected one identifies the theory it was meant to address. As the content of each is virtually identical, there is no basis for a determination that the jury was instructed with respect to warnings and product risk justification in breach of warranty and not in strict liability.

b. There Was Substantial Evidence to Support the Judgment on the Verdict for Defendant Robins' Liability for Compensatory Damages.

Defendant Robins argues at length that the cause of plaintiff's injuries was the misuse of the Dalkon Shield. In this argument, defendant points to the fact that the IUD device was inserted into plaintiff less than eight weeks after childbirth contrary to warnings that the insertion should not be done before that period of time. The Shield was inserted seven weeks after the date of birth but there was substantial evidence that plaintiff's injuries did not result from premature insertion. This evidence includes the testimony of plaintiff's expert who ruled out insertional perforation in the six to eight-week period following childbirth and factual testimony that nothing adverse happened to plaintiff for a considerable period of time after the device was inserted.

Defendant then states that plaintiff suffered no real adverse symptoms until her December 1973 abortion and that the Dalkon Shield was not removed at this time. The defendant seems to be asking this court to find that the abortion plus the failure to remove the Shield was doctor misuse which was the cause of plaintiff's injuries. It is undisputed, however, that neither Dr. Brown nor the doctor performing the abortion could find the IUD immediately before this abortion and during the medical procedure because neither the string nor the Shield was detected or found. This is substantial evidence supporting the judgment against defendant Robins on the factual basis that

the device had migrated through the walls of the plaintiff's uterus into other parts or areas of her pelvic cavity and was not discovered by the use of ordinary medical procedure at this time.

Next, defendant contends there was doctor misuse because the doctors failed to use X-rays to try to locate the Shield. There was conflicting evidence on this point. Substantial evidence was presented by plaintiff that the doctors believed the IUD had been involuntarily expelled at this time because no string or Shield was discovered *and plaintiff was* pregnant. X-rays would have been unnecessary under these circumstances. Even Dr. Baker's concern and note about the possibility the IUD was still in plaintiff was equivocal. In fact the doctors did use X-rays.

Even though X-rays were actually taken and revealed no IUD present in plaintiff, there was substantial although disputed evidence permitting a reasonable inference to be drawn that no doctors except the ones who actually found the Dalkon Shield during major abdominal surgery months after the December 1973 therapeutic abortion, were aware of the low level of radiopacity of the device and would have found the embedded IUD outside of plaintiff's uterus using X-rays. The warnings by defendant manufacturer of the radiopaque property of the plastic Dalkon Shield requiring special X-ray techniques were tenuous and equivocal at best and were not even given to radiologists and, in fact, were given only limited distribution. This claim of the failure of some doctors to use X-rays to locate the IUD is not a convincing one under the substantial evidence rule and is rejected.

Finally, defendant Robins points to a further claim of misuse because Dr. Baker took no action for one week after he found the Dalkon Shield string when he removed the other IUD (the Lippes Loop) despite plaintiff's great distress and despite the fact that the doctor felt the Shield was somewhere inside plaintiff. The jury, on the basis of the conflicting but substantial evidence, was justified in finding no misuse at this time. The doctor took X-rays which, because of their poor quality, showed nothing. He sent her to a radiologist who appeared to be unaware of the radiopaque problem of the plastic IUD and was unable to detect it. The fact was, based on testimony of subsequent medical procedures, that the device was already outside plaintiff's uterus at the time, embedded in her fallopian tube. Whether plaintiff's pelvic inflammatory symptoms were caused by Dr. Baker's pulling on the string accelerating the bacterial wicking action is a question of fact. The evidence considered by the jury was just as supportive of the proposition that the Dalkon Shield had already done its damage, it had penetrated the walls of plaintiff's uterus and plaintiff was suffering from severe pelvic inflammatory disease and internal injuries. The fact that Robins' IUD was found in a sterile abscess in plaintiff's fallopian tube does

not help the defendant because the lack of bacteria or other microorganisms appears to have been the result of the massive antibiotic treatment plaintiff had received shortly before the IUD was discovered.

Defendant Robins, in essence, is arguing the sufficiency of the evidence, contending that the evidence was insufficient to support a finding that plaintiff's injuries were the proximate result of defendant's negligence or strict product liability.

It is well settled that appellate review of the sufficiency of the evidence is governed by the substantial evidence rule. If there is substantial evidence, contradicted or uncontradicted, which supports the conclusion reached by the trier of fact, the judgment must be affirmed. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) " '. . . [I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the findings as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion.' " (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602].) Factual matters will be viewed most favorably to the prevailing party. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) Conflicts in the evidence will be decided in favor of the prevailing party. (*Cecka* v. *Beckman & Co.* (1972) 28 Cal.App.3d 5, 14 [104 Cal.Rptr. 374].)

There is substantial evidence here to support the jury verdict in favor of plaintiff Hilliard and against defendant Robins.

c. Plaintiff's Lawyer was Not Guilty of Prejudicial Misconduct Requiring a Reversal of the Judgment.

 Defendant Robins recites a litany of alleged misconduct by plaintiff's lawyer which, it urges, effectively denied it a fair trial. Defendant lists six different types of misconduct perpetrated by plaintiff's lawyer: (1) reference to death and cancer, (2) inflammatory reference to the Dalkon Shield, (3) abusing and berating witnesses and opposing counsel, (4) violations of court orders and rulings, (5) use of "do you know" questions, and (6) the making of statements lacking foundation. Defendant's timely objections to each of these instances of misconduct were sustained by the trial court, but in most if not all situations defendant failed to ask the court that the jury be admonished to ignore the statements or questions of plaintiff's lawyer and the jury was not so instructed during trial except in one or two situations and then voluntarily by the judge. (*Sabella* v. *Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750].)

Defendant Robins has waived its claim of misconduct on appeal in most of its claims unless a proper admonition was ineffectual to cure the misconduct because it was irremedial and prejudicial. (*Tobler* v. *Chapman* (1973) 31 Cal.App.3d 568, 576-577 [107 Cal.Rptr. 614].)

It is only in the extreme case that the impropriety and prejudice of a lawyer's misconduct cannot be removed by an instruction to a jury to disregard it. (*Horn* v. *Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].) We ignore the fact that in most claims of misconduct no admonition was requested or given in order to discuss whether there was any prejudice to defendant Robins by the conduct of plaintiff's lawyer.

In our examination of the record, we do not find that the conduct of plaintiff's lawyer was blatant or in bad faith, or that he ignored or disregarded the standards of professional conduct. The zeal, the enthusiasm and the conduct of plaintiff's lawyer in her cause was often lacking in restraint. The conduct was at times overly active, aggressive, pushy, and sometimes exaggerated but it was not prejudicial so as to require a reversal. Our conclusion is fortified by the fact that the trial court impliedly found no misconduct, or at least no prejudice, when ruling on the motion for new trial. "A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly wrong." (*Cope* v. *Davison* (1947) 30 Cal.2d 193, 203 [180 P.2d 873, 171 A.L.R. 667].)

The showing made by defendant Robins falls short of meeting this requirement. We do not find the conduct of plaintiff's lawyer so egregious considering ". . . the whole record . . ." to conclude that ". . . the harm resulted in a miscarriage of justice . . ." (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468]; *Grimshaw* v. *Ford Motor Co.,* *supra,* 119 Cal.App.3d 757, 797-798 (approving the *Green* rule in civil cases).)

This was not an extreme case of prejudicial bad conduct. This was a lengthy trial, with thousands of questions, hundreds of exhibits, and long arguments to the jury. The factual issues were complex and emotional. It was inevitable that the lawyers, swept up in subjective feelings for their respective clients, in a few instances, might have overstepped the permissible line of proper lawyering conduct. "The able trial judge in the instant case did not permit the trial to degenerate into a free-for-all. He exercised firm and fair control over the conduct of the trial . . . , admonished counsel when necessary, and . . . reminded the jury that what counsel said was not

evidence. We find no misconduct or miscarriage of justice. . . ." (*Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d 757, 797.) Plaintiff's lawyer was not guilty of prejudicial misconduct requiring a reversal.

Finally, as we have already stated, there was substantial evidence presented to the jury to support the verdict, independent of the instances of alleged lawyer misconduct cited by defendant Robins in this long, nineteen-week trial. The nine to three verdict does not necessarily suggest to this court that this was a "closely balanced" case. It is, of course, entirely possible that the three jurors who did not join in the verdict disagreed with the other nine only in the amount of the compensatory damages. There was no miscarriage of justice; there was no misconduct or prejudice to defendant Robins.

d. DEFENDANT ROBINS WAS NOT DEPRIVED OF A FAIR TRIAL BY PREJUDICIAL PUBLICITY.

▆▆▆▆ Jurors violate their oath (Code Civ. Proc., § 604) if they receive impressions about the case from a source other than from the evidence presented in open court. It is improper for a juror, during the trial, to receive impressions from news media about the subject of the litigation. Reading newspaper articles, listening to news reports or watching a television program likely to influence a juror's verdict constitutes grounds for a mistrial, a new trial, or reversal. All of these principles come to us from criminal cases because civil trials seldom receive prejudgment publicity in the news media. (See *People* v. *Harris* (1981) 28 Cal.3d 935, 948-949 [171 Cal.Rptr. 679, 623 P.2d 240]; *People* v. *Lessard* (1962) 58 Cal.2d 447, 454 [25 Cal.Rptr. 78, 375 P.2d 46]; *People* v. *Byers* (1970) 10 Cal.App.3d 410, 415-416 [88 Cal.Rptr. 886].) There are some reported civil cases in California that express essentially the same principles. (*Kritzer* v. *Citron* (1950) 101 Cal.App.2d 33, 36 [224 P.2d 808], is a case in which a juror discussed the malpractice litigation with her doctor; the case discusses the general rules of a juror receiving information from a source outside the courtroom but it is not a media case.)

If jurors receive impressions about the case from outside sources and the result is prejudicial, then, and only then, is a mistrial, a new trial or a reversal the appropriate remedy. A juror's exposure to publicity concerning a party's activities does not presumptively deprive a party of his, her or its right to due process and a fair impartial trial. (*People* v. *Harris, supra,* 28 Cal.3d 935, 949.) Jurors need not be totally ignorant of the issues involved in a case so long as they are able to put aside any preconceived impression and render a verdict on the basis of evidence presented in the court alone.

(*Id.*, at p. 950.) The same rule applies to impressions received from publicity during trial.

Insignificant infractions of these principles do not necessarily require a reversal. If the misconduct is of a trifling nature in that neither party could be prevented from having a fair trial, the judgment on the verdict should be affirmed. (*Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 954 [182 Cal.Rptr. 176].)

■ ". . . [A]n appellate court should accord great deference to a trial judge's evaluation of the prejudicial effect of jury misconduct." (*Id.*, at pp. 954-955; accord *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 795-796 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], but as we discuss next, in determining whether a party has had a fair trial, the reviewing court must independently examine the record and make its own judgment. (*People* v. *Harris, supra,* 28 Cal.3d 935, 948-949.)

■ In the case at bar, it appears that there were ten media reports about the Dalkon Shield published in the greater Los Angeles area during the lengthy nineteen-week trial. Three of these articles appeared in Orange County newspapers. None of the jurors subscribed to these papers or appear to have known about the articles. The jury was admonished throughout the trial on the subject of outside publicity. Voir dire was conducted at the beginning, the middle and at the end of the trial. The court is entitled to presume that the jury heeded the trial court's admonitions. (*People* v. *Lanphear* (1980) 26 Cal.3d 814, 836, fn. 12 [163 Cal.Rptr. 601, 608 P.2d 689].)

Four jurors, who were among the nine voting in plaintiff's favor on the verdict, heard or saw some of the news items about the Dalkon Shield. The record on appeal includes the voir dire testimony of those four jurors. We have read and analyzed these transcripts and the entire record. "Inferences of possible prejudice may be refuted by information found in the record of the voir dire and trial." (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 187 [132 Cal.Rptr. 265].)

It is our independent judgment that the exposure of the jurors to the publicity about the Dalkon Shield and the other lawsuit against the defendant Robins did not influence the jurors, did not affect the outcome of this trial, did not deprive defendant of a fair, impartial jury trial and was not prejudicial.

e. The Trial Court Did Not Commit Reversible Error in Admitting Evidence Against Defendant Robins.

Defendant Robins complains that the trial court admitted irrelevant prejudicial evidence over its objection. The evidence concerned four topics: (1)

evidence about the pregnancy rate of the Dalkon Shield, (2) evidence about the activities of Robins' detailmen,[26] (3) Robins' post-1974 activities and (4) the alleged contamination of the Dalkon Shield's plastic matrix during the production process.

Our review of these claims of error has been severely hampered by the failure of defendant Robins to make appropriate reference to the record. (California Rules of Court, Appellate Rules, rule 15(a).) When a brief fails to comply with the requirements of the rules on appeal we can, as we do here, ignore the defect and consider the brief as if it were properly prepared. (*Id.*, rule 18.) This has been a difficult and burdensome task. The reporter's and clerk's transcripts of the proceedings in this lengthy trial amounted to thousands of pages. In accepting the responsibility of searching the record for the purpose of discovering the alleged evidentiary errors not pointed out in defendant's brief, we have failed to discover any prejudicial error by the trial court in admitting evidence in defendant's four specified topics.[27] (See *Fox v. Erickson* (1950) 99 Cal.App.2d 740, 742 [222 P.2d 452].)

■ The pregnancy rate of the Dalkon Shield was relevant and admissible. The device was inserted in plaintiff as a contraceptive. While plaintiff's other damage claims or injuries seem far more significant, she did become pregnant after she had the Dalkon Shield inserted into her. This is a meaningful, factual circumstance for the jury to have considered in the liability and damage phase of the case and was also supporting evidence for one of plaintiff's claims for punitive damages. (See *Stills v. Gratton* (1976) 55 Cal.App.3d 698 [127 Cal.Rptr. 652] (unsuccessful abortion, child born healthy, mother starts a tort cause of action); *Custodio v. Bauer* (1967) 251 Cal.App.2d 303 [59 Cal.Rptr. 463, 27 A.L.R.3d 884] (unsuccessful sterilization operation).) The evidence was relevant to plaintiff's claim of negligence, strict liability or breach of express warranty.

■ The question remains, however, whether evidence of allegedly "false" or inaccurate pregnancy rates is inadmissible as claimed by defendant Robins. Dr. Dekle, who fitted plaintiff Hilliard with the Robins' IUD, testified he relied, in part, on what he was told by detailmen and what he had seen in Robins' promotional material in using and recommending the Dalkon Shield. He was dubious about the low pregnancy rate claimed for the Dalkon Shield, yet he did not anticipate the rate would exceed two percent based on Robins' promotional efforts and his experience. This evi-

---

[26]A detailman is a combination salesperson and public relations person who promotes the use of drugs, devices and supplies of medical and pharmaceutical manufacturers and distributors to doctors and dentists.

[27]Plaintiff's brief does give us some direction and help as she does have specific references in the reporter's transcript to some of defendant's contentions of evidentiary error.

dence was clearly admissible and relevant. If the evidence showed that the rate was substantially higher than the advertised rates in 1972, when Dalkon Shield was placed in plaintiff's uterus, the doctor might not have used that IUD or perhaps any IUD.

The activities of Robins' detailmen was relevant and admissible before and after the device was placed in plaintiff. Despite defendant's statement in its appellate brief, unsupported by the record, that Robins' detailmen had "no effect on Dr. Dekle's actions", the doctor testified that he relied in part on literature given him by a Robins' detailman in prescribing the Dalkon Shield. The detailmen, who saw Dr. Baker and Dr. Smith, told these doctors that the Shield was easily removable, that it would not become embedded, and that it had been thoroughly tested. Dr. Baker testified that if he had been told by the detailmen of the incomplete testing or of the wicking potential, he would have recommended to plaintiff the immediate removal of the device. To argue that this evidence is not relevant or admissible is spurious.

The statement by Robins that evidence of its activities with the Dalkon Shield after plaintiff had the device removed was irrelevant or inadmissible is puzzling. At the time this evidence was admitted by the court, no bifurcation order of the punitive damage issue had been made. The plaintiff had the burden of showing that defendant Robins acted with conscious disregard of the safety of *others* when it was aware of the probable dangerous consequences of its conduct and wilfully and deliberately failed to avoid those consequences. (*Taylor* v. *Superior Court, supra,* 24 Cal.3d 890.)

On the issue that defendant wilfully and deliberately failed to avoid the consequences, evidence is admissible of its subsequent conduct to show that it continued to sell the devices without change and with an awareness of its probable dangerous consequences. (See *Blank* v. *Coffin, supra,* 20 Cal.2d 457.) (See a more detailed discussion of the admissibility of subsequent activities of Robins in part 6, pp. 398-402 of this opinion.)

The position of Robins that evidence of the "alleged contamination of the plastic material" was not relevant or admissible because plaintiff suffered no ill effects from the product's plastic content simply misses the point. The evidence of the chemical properties of the plastic device were admitted into evidence in connection with the plaintiff's issue that defendant failed to validate its sterilization techniques or tests and to test for microorganism in the tail string. There was conflicting evidence on this issue and the trial court properly permitted all of the evidence to be admitted.

f. The Award of Compensatory Damages was Not Excessive.

The final contention of error by Robins is that the $600,000 award to plaintiff for compensatory damages was excessive. Defendant Robins tells us that plaintiff failed in two ways to submit evidence to support this award. First, plaintiff presented no evidence as to special damages. Second, a substantial part of plaintiff's injury was due to elective voluntary surgery, her therapeutic abortion and a hysterectomy.

We reject defendant's contentions. There is no convenient yard stick to determine whether a jury's damage award is excessive, too little, or just right. The legal test is one of reasonable compensation. (Civ. Code, § 3359.) The jury in the case at bar was instructed with BAJI No. 14.00 which told them that damages are to provide reasonable compensation. They were also instructed that they could award damages for loss of earning capacity (BAJI No. 14.12) and for pain and suffering (BAJI No. 14.13).

Defendant claims that plaintiff must present proof of special damages or monetary loss to justify a compensatory damage award of $600,000. This is not a correct statement of the law. ■■■ There is no requirement in California law that a plaintiff seeking compensatory damages which include damages for pain and suffering and for loss of future earning capacity must prove actual special damages such as medical expenses and loss of earnings. Civil Code section 3333 provides that for torts, ". . . the measure of damages . . . is the amount which will compensate for all the detriment proximately caused. . . ."

■■■ Loss of earning power is an element of general damages that may be inferred from the nature of the injury, with or without proof of actual earnings or income either before or after the injury. (*Connolly* v. *Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 489 [319 P.2d 343]; *Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 462 [130 Cal.Rptr. 786].) The test is not what the plaintiff would have earned in the future but what she could have earned. This is an element of general compensatory damages. Such damages are ". . . awarded for the purpose of *compensating* the plaintiff for injury suffered, i.e., restoring . . . [her] as nearly as possible to . . . [her] former position, or giving . . . [her] some pecuniary equivalent. (See Rest, Torts, §§ 901, 903, 905, 906; C.C. 3333; 54 Cal. L.Rev. 1559; 19 Hastings L.J. 1071; 22 Am. Jur.2d, Damages, §§ 11 et seq., 80 et seq.; BAJI (5th ed.) Nos. 14.00, 14.01.)" (Italics in the original.) (4 Witkin, Summary of California Law (8th ed) Torts, § 842, pp. 3137-3138.) Impairment of the capacity or power to work is an injury separate from the actual loss of earnings. (*Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 656 [151 Cal.Rptr. 399].) The plaintiff may recover even where she was

not working and earned nothing. (*Tornell* v. *Munson* (1947) 80 Cal.App.2d 123, 125 [181 P.2d 112].)

 Plaintiff is entitled to recover damages for physical pain and for mental suffering from her physical injury. These injuries constitute the principal elements of tort personal injury damage. An award failing to compensate an injured plaintiff where pain and suffering was present is inadequate as a matter of law. (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 893 [103 Cal.Rptr. 856, 500 P.2d 880].) Pain and suffering are detriment factors for which an injured plaintiff must be compensated if these detriment factors are caused by defendant's tort. (Civ. Code, § 3333.) The absence of medical bills or medical testimony will not foreclose a recovery for pain and suffering. (See *Capelouto* v. *Kaiser Foundation Hospitals, supra,* 7 Cal.3d 889, 895.) "Moreover, even in the absence of any explicit evidence showing pain, the jury may infer . . . pain, if the injury is such that the jury in its common experience knows it is normally accompanied by pain." (Citation.) (*Id.,* at p. 896.) The ordeal of plaintiff Hilliard from the time the Dalkon Shield was inserted into her uterus to her hysterectomy was substantial evidence permitting the jury to infer pain even if she had not testified to her pain. Her calamitous experiences to the date of the trial were such that the jury could infer great mental anguish, pain, and suffering.

 The plaintiff's election to voluntarily have the abortion in 1973, and the second abortion and the hysterectomy as her final surgery does not detract from, or discredit the damage award. These medical procedures were directly or proximately caused by the presence of the Robins' IUD in her pelvic cavity outside the uterus and the damage that it had caused to her female reproductive system and to other organs in her pelvic cavity. These injuries continued to cause her severe problems even after the IUD was removed. The device, in a part of plaintiff's body where it was not supposed to be, caused plaintiff unusual pain, weakness, and discomfort during her 1973 pregnancy even though neither she nor her doctors were sure of the cause or source of the pain at the time of the first abortion. These feelings of plaintiff, caused by the Dalkon Shield, compelled plaintiff to make the first abortion election.

Her fears of an abnormal birth or a defective child in her last pregnancy were the result of the pain, the discomfort and the mental anguish she suffered. The fears were heightened by her numerous major abdominal surgeries.

The subject of defendant's claims about the voluntary surgeries were questions of fact for the jury. The jury had to consider the elective medical

procedures against the evidence of her continued pain and fears caused by the Dalkon Shield damage to her female organs. The defendant, in this argument, has failed to show that there was not substantial evidence on which the jury could have based its verdict. ". . . [M]ere conflict in evidence will not suffice." (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 402 [185 Cal.Rptr. 654, 650 P.2d 1171].)

■ An award of excessive damages by a jury verdict is erroneous. A reviewing court, on appeal, may reverse a judgment based on an excessive damage award. The primary responsibility of examining the amount of the jury's damage award rests on the trial court which is more familiar with the evidence than the appellate court. The trial judge's determination on a motion for a new trial on the issue of excessive damages is usually upheld.[28] (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) ■ Our review of the record demonstrates that the trial judge was correct in denying defendant's motion for a new trial on this ground. Viewing the entire record most favorably to the jury verdict, the compensatory damage award of $600,000 was supported by substantial evidence.[29] (*Id.,* at p. 65, fn. 12.) The evidence of plaintiff's injury, her pain and suffering, her impaired earning capacity and her disability substantially support the amount of the award. The size of the award is not a reason for reversal. (*Rodriguez* v. *McDonnell Douglas Corp., supra,* 87 Cal.App.3d 626, 654.) Plaintiff's injuries were catastrophic. (*Id.,* at p. 655.) The compensatory damage award was not excessive.

### 8. THE TRIAL COURT DID NOT ERR IN GRANTING A NONSUIT ON PLAINTIFF'S FRAUD CAUSES OF ACTION

■ The elements of a fraud cause of action are: (1) a misrepresentation of a material fact, (2) knowledge of the falsity, (3) intent to induce reliance,

---

[28]An appellate court does not weigh the evidence on damages and will reverse a judgment on appeal only if no substantial evidence supports the award. The trial judge is, however, not bound by the substantial evidence rule and may grant a new trial if he or she believes the award is against the weight of the credible evidence. (See *Schroeder* v. *Auto Driveway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662].) "In reviewing . . . [the damage amount] . . . , the trial court is vested with the power, denied to us, to weigh the evidence and resolve issues of credibility." (*Ibid.*) A trial court's ruling, denying a claim that a damage award was excessive, applying a more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule is entitled to great weight.

[29]The motion for new trial on ground of excessive damages in the case at bar was made under the provisions of Code of Civil Procedure section 657, subdivision 5 which does not mention "the result of passion and prejudice" as a ground for a new trial. In *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059], our Supreme Court said that a reference to "passion and prejudice" was no longer appropriate. (*Id.,* p. 59, fn. 10.)

(4) actual and justifiable reliance, and (5) resulting damages. (*Hart* v. *Browne* (1980) 103 Cal.App.3d 947, 957 [163 Cal.Rptr. 356].) If plaintiff has failed to present evidence on the existence of any of these elements, a nonsuit is proper. (*Roland* v. *Hubenka* (1970) 12 Cal.App.3d 215, 220 [90 Cal.Rptr. 490].) ■■■ A nonsuit will not be set aside unless plaintiff presents evidence of some substance on which reasonable minds could differ. Evidence that does no more than raise speculation or conjecture will not sustain plaintiff's burden of proof. (*Ulwelling* v. *Crown Coach Corp.* (1962) 206 Cal.App.2d 96, 104-105 [23 Cal.Rptr. 631].) The evidence is totally lacking that defendant Robins knowingly made a deliberate misrepresentation of fact to plaintiff's doctors. The evidence did show negligence on the part of Robins in the information it distributed to doctors through its advertising material and detailmen. There is substantial evidence that Robins acted in conscious disregard of the rights and safety of others in its statements concerning awareness of the probable dangerous consequence of its conduct. We cannot find, however, any direct evidence of a deliberate false representation or evidence from which a jury could infer the instance of a misrepresentation of a material fact by defendant Robins to plaintiff or her doctors.

Plaintiff totally failed to present evidence that Dr. Delke or plaintiff's subsequent doctors relied on any fraudulent misrepresentation.[30]

We repeat, the nonsuit for the fraud claims was not error.

## CONCLUSION

The portion of the judgment, as amended by this court, directing a verdict on the bifurcated issue of punitive damages is reversed. The remaining portion of the judgment, as amended, is affirmed.

Spencer, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied November 22, 1983, and the petition of defendant and appellant for a hearing by the Supreme Court was denied February 2, 1983.

---

[30]A lay person, with no medical or pharmaceutical expertise, has the right to rely on representation made to her doctor. (See *Dyke* v. *Zaiser* (1947) 80 Cal.App.2d 639, 650 [182 P.2d 344].)