[L. A. No. 24705.   In Bank.   Dec. 17, 1957.]

MAUREEN CONNOLLY, Respondent, v. PRE-MIXED CONCRETE COMPANY (a Corporation) et al., Appellants.

Luce, Forward, Kunzel & Scripps, Edgar A. Luce and Leland C. Nielsen for Appellants.

Melvin M. Belli, John D. Butler and Butler, Kaminar & Sorbo for Respondent.

GIBSON, C. J.—Plaintiff was injured when her horse became frightened by a cement mixer truck owned by defendant corporation and operated by its employee, defendant Stevens. The case was tried before a jury which returned a verdict in favor of plaintiff in the amount of $95,000. Defendants have appealed, contending that the trial court erred in giving an instruction on the doctrine of last clear chance and that the damages awarded are excessive.

Stevens made a left turn from Colusa Road onto Friars Road, a two-lane highway about 18 feet wide with dirt shoulders four feet wide on each side. He was then traveling at a speed of approximately 15 miles an hour, and he could easily have stopped within 20 feet. The exhaust pipe of the truck was worn through, and the cement mixer, which was operated by a separate motor, was revolving. There was a great deal of noise from the two motors and the faulty exhaust pipe, and there was some cement in the mixer which added to the noise. Plaintiff and two other girls were riding on horseback along Friars Road toward Colusa Road, which was between 250 and 350 feet away. Plaintiff was in the lead, and she and one companion were on one shoulder of the road, and the third rider was on the other shoulder. When the truck turned into Friars Road, the horses became frightened by the noise, and the riders shouted and waved at Stevens to stop. Stevens saw the riders when he "straightened out" after making the turn, and he noticed that the horses were "mincing and moving around across back and forth

around the road'' and that the riders were waving. Although he could not hear what they were saying because of the noise from the truck, he thought that they wanted him to slow down or stop. He realized there was ''a little danger there'' and he thought that ''the best thing . . . was to proceed beyond where the horses were and get the noise away. . . .'' He continued down the middle of the road at a reduced speed, and as the truck came closer the horses became ''practically frantic'' with fright. They were ''dancing, prancing around, moving in and out of the road, off on the shoulder, back and forth, and in general just milling around.'' Stevens was watching the girl on his right because he feared that her horse might go over a bank on that side of the road, and, as he came abreast of plaintiff, who was on his left, he swerved onto her side of the road. Her horse whirled, her right leg was ''caught'' by the left rear mudguard of the truck and she was thrown to the ground. Her leg was severely lacerated below the knee, the muscle was torn loose and the bone was visible. Plaintiff was taken by an ambulance to a hospital where she was in surgery for about three hours. She remained in the hospital for 10 days, and her leg was in a cast for several weeks afterward.

Section 532 of the Vehicle Code provides that the driver of any vehicle approaching a ridden animal shall reduce speed or stop as may appear necessary or as may be requested in order to insure the safety of the rider.*

In *Brandelius* v. *City & County of San Francisco,* 47 Cal.2d 729, 743 [306 P.2d 432], the last clear chance formula was restated as follows: ''The doctrine of last clear chance may be invoked if, and only if, the trier of the facts finds from the evidence: (1) that the plaintiff was in a position of danger and, by his own negligence, became unable to escape from such position by the use of ordinary care, either because it became physically impossible for him to escape or because he was totally unaware of the danger; (2) that defendant knew that plaintiff was in a position of danger and further knew, or in the exercise of ordinary care should

---

*Section 532 of the Vehicle Code provides: "The driver of any vehicle approaching any horse-drawn vehicle, any ridden animal or any live stock shall exercise proper control of his vehicle and shall reduce speed or stop as may appear necessary or as may be requested by any person driving or riding any animal or by any person in charge of any such live stock in order to avoid frightening and to safeguard any such animal or live stock and to insure the safety of any person driving or riding such animal or in charge of such live stock."

have known, that plaintiff was unable to escape therefrom; and (3) that thereafter defendant had the last clear chance to avoid the accident by the exercise of ordinary care but failed to exercise such last clear chance, and the accident occurred as a proximate result of such failure.''

On the issue of plaintiff's negligence there was testimony that she knew that her horse occasionally whirled around when excited and that, a few minutes before the accident, her horse became frightened and whirled when a large crane passed along the road. There was also evidence that plaintiff could have avoided the traffic on the road by taking an alternative route over a bridle path which she had previously used. Defendants, relying on this evidence, contended at the trial that their pleaded defense of contributory negligence had been established, and the court instructed the jury on that issue. In view of the record defendants cannot, and they do not, attack the last clear chance instruction on the ground that there was no evidence of plaintiff's negligence.

Instead, it is defendant's position that the doctrine of last clear chance is inapplicable because, they urge, plaintiff could have removed herself from danger by dismounting at any time until an instant before the accident occurred, at which instant Stevens had no chance to avoid it. They argue that plaintiff was in no danger while her horse remained on the shoulder of the road, that she was not placed in a position of danger until her horse whirled around, at which time the truck was passing her, and that it was then too late for the driver to avoid the accident. The record, however, does not compel such a conclusion as a matter of law. Whether plaintiff had the asserted ability to extricate herself from her position of danger by dismounting, whether it would have been more dangerous for her to attempt to dismount from a frightened horse as the truck approached, whether Stevens knew, or in the exercise of ordinary care should have known, that plaintiff was unable to escape from her peril, and whether he thereafter had a clear chance to avoid the accident by the exercise of ordinary care, were all questions of fact for the jury which heard the evidence and viewed the terrain at the scene of the accident. The giving of the instruction, therefore, was not error.

Nor can we agree that the judgment must be reversed upon the ground that the damages awarded were excessive. The general rule is that the amount of damages fixed by the jury

and thereafter approved by the trial court on denial of a motion for a new trial will not be disturbed on appeal unless the evidence shows that the award is so disproportionate to any reasonable limit of compensation as to indicate that it was the result of passion, prejudice or corruption on the part of the trier of fact. (*Ericksen* v. *Southern Pac. Co.*, 39 Cal.2d 374, 382 [246 P.2d 642]; see 15 Cal.Jur.2d 41.)

As a result of the accident, considerable muscle tissue in plaintiff's right leg was destroyed, and she suffered a loss of about 40 per cent of the blood supply to her right foot. The pulse in the artery at the top of her right foot was markedly weak and was absent part of the time, indicating that the circulation was impaired and that a major blood vessel was blocked. When there is such an impairment and the muscles are exercised, an aching or cramping type of pain or weakness usually results. In the opinion of a specialist who treated her, she will have difficulty with her leg and foot in middle and older age.

Plaintiff, who was about 20 years old when she was injured, was a champion tennis player. She started competition when she was 11 and was the National Junior Girls Singles Tennis Champion at 14 and 15. She won the National Womens Singles Title three times and was preparing to compete for the fourth time. For three successive years she won at Wimbledon, and the year preceding her accident she had also won the French, Australian and United States championships, thus winning the four major championships of the world. She was twice named as Woman Athlete of the Year in a newspaper poll. Plaintiff made several attempts to play tennis after the accident but found that shooting pains developed in her leg, and she stopped playing the game because of her injuries.

The accident occurred in July 1954, and it had been plaintiff's intention to take part in the United States championship tournament and then turn professional in October. She planned to go on a three-months' professional tennis tour, for which she had been offered a percentage of the receipts, with a guarantee of $30,000. It was estimated that she would have received $62,500 if the tour had continued outside the United States, that she would have received additional sums from various sources, such as endorsements of sporting goods and other articles, and that she would have cleared $50,000 during that year. Other witnesses estimated that her earnings during her first year as a professional would have been

$75,000. There was evidence that plaintiff had not yet reached the peak of her career and that she could expect at least seven or eight years' participation as a professional.

The witnesses who testified as to plaintiff's earning capacity had extensive knowledge of professional tennis, and their opinions were based on their experience and information concerning the amounts earned by other tennis players. One of the witnesses had been a professional champion for six years and had conducted two professional tours. Another witness, who had been connected with tennis for 36 years, had been on the Australian Davis Cup team for a number of years and was a writer on tennis for a newspaper. A third witness, the sports director for a broadcasting system, had been a professional athlete and was familiar with the earning capacity of champion tennis players.

Loss of earning power is an element of general damages which can be inferred from the nature of the injury, without proof of actual earnings or income either before or after the injury, and damages in this respect are awarded for the loss of ability thereafter to earn money. (*Hicks* v. *Ocean Shore Railroad, Inc.,* 18 Cal.2d 773, 784 [117 P.2d 850]; *Storrs* v. *Los Angeles Traction Co.,* 134 Cal. 91, 93 [66 P. 72]; *Ridley* v. *Grifall Trucking Co.,* 136 Cal.App.2d 682, 688 [289 P.2d 31]; *Ostertag* v. *Bethlehem etc. Corp.,* 65 Cal.App.2d 795, 807 [151 P.2d 647].)

When consideration is given to all the circumstances, including the loss of earning power and the nature of the injury, we cannot say that the verdict is excessive.

The judgment is affirmed.

Shenk, J., Carter, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.

Appellants' petition for a rehearing was denied January 15, 1958.