[No. B106474. Second Dist., Div. Four. Sept. 29, 1998.]

TARA GARGIR, Plaintiff and Respondent, v.
B'NEI AKIVA, Defendant and Appellant.

COUNSEL

Wilson, Elser, Moskowitz, Edelman & Dicker, Vincent D'Angelo, Greines, Martin, Stein & Richland, Irving H. Greines and Barbara W. Ravitz for Defendant and Appellant.

Barry Novack for Plaintiff and Respondent.

OPINION

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

This is a personal injury action. Defendant organized a group of teenagers for a skiing trip. On the trip, plaintiff, who had never skied, fell down while she was on her skis and sustained serious injury to her knee. She sued defendant claiming that it had negligently failed to supervise and control the group of teenagers, many of whom were novice skiers. The jury found defendant negligent but also found plaintiff to have been 50 percent at fault. As so reduced, the judgment recovered by plaintiff was $600,000.

On this appeal, defendant's primary contention is that the trial court committed prejudicial error by refusing to submit BAJI No. 2.22, "Witness Willfully False." On the facts of this case, we find the error to be nonprejudicial. Defendant's secondary contention is that the trial court erred in submitting BAJI No. 14.12 about plaintiff's right to recover damages for loss of future earning capacity because there was no evidence to support such a claim. We find no merit to that contention.

### STATEMENT OF FACTS

At the time of the accident, plaintiff Tara Gargir was 16 years old. In January 1993, she, along with others, had worked as a volunteer counselor at a camp operated by defendant B'Nei Akiva. To reward her and approximately 20 to 30 other teenage counselors for their good work, defendant, on February 15, 1993, took them on a one-day ski trip to Snow Valley in Big Bear.[1] Plaintiff had never before skied. Plaintiff's parents orally consented to the trip. Golan Ben Lulu (Ben Lulu), an employee of defendant, was in charge of the group. He had skied on only one prior occasion. He purchased

---

[1] Prior to trial, Snow Valley, which had been named as a defendant and a cross-defendant, extricated itself from the litigation in a summary judgment proceeding.

a beginner's ski package for everyone. The package included skis, an optional ski lesson, and a ski lift ticket for the beginner or intermediate slopes. Plaintiff signed, as did the other participants, a form entitled "Rental Agreement and Release of Liability." The form included the statements: "I understand and am aware that skiing is a **HAZARDOUS** activity" and "I agree and understand that this [equipment] may **NOT** reduce the risk of injuries to this user's knees or any other parts of this user's body." (Boldface in original.) Plaintiff testified she did not read the form before signing it.

Plaintiff and two of her friends, Tova Leichter and Debbie Shopft, put on their skis in the locker area and proceeded to the ski lift which went to the beginning slope. Plaintiff intended to take the lift to the top of the slope and ski down. Plaintiff encountered great difficulty in walking on her skis to the lift, slipping several times. These difficulties did not deter plaintiff because she "thought it would be easier to go down the slope than to walk on the flat ground." A Snow Valley employee helped her onto the lift; she did not tell him she was having any problem walking on her skis. When she alighted from the lift at the top of the slope, she slipped again and one ski came off. A Snow Valley employee helped her put the ski back on because she "didn't know how to." As she and her friends stood at the top of the slope, plaintiff fell, this time seriously injuring her left knee. In the following years, plaintiff has had six knee surgeries, with medical expenses of approximately $75,000. Her future medical expenses are estimated to be between $25,000 and $150,000.

As explained in her opening statement, plaintiff's theory of the case was that defendant was negligent because "these 20 to 30 youths taken on this ski trip by [defendant] were basically on their own, without guidance, without supervision, without control, without input." Plaintiff's expert witness testified that defendant's negligence manifested itself in several ways. These included Ben Lulu's lack of experience with skiing; the failure to obtain written (as opposed to oral) consent from the parents; the failure to obtain medical release forms from the parents; the failure to survey the youths about their familiarity and experience with skiing; the failure to inform the youths that lessons were available; and the failure to require that first-time skiers take lessons.

One of the contested issues at trial was whether plaintiff and the other counselors were told about the option of taking ski lessons. Contradictory testimony was produced on this issue.

According to plaintiff, neither Ben Lulu nor anyone else announced that lessons were available. She was unaware that lessons were available and would have taken one had Ben Lulu so recommended.

Plaintiff's testimony was squarely contradicted by that of her friend, Tova Leichter, a fellow counselor with whom she spent the day. Leichter, called as a witness by plaintiff, testified on cross-examination that she, Debbie Shopft, and plaintiff discussed whether to take a lesson and made a joint decision not to do so because they wanted to begin skiing immediately. Plaintiff flatly denied this discussion took place. (The third participant, Shopft, did not testify at trial.) Leichter did not remember whether Ben Lulu told her about the lessons or whether she learned of their availability from speaking with other counselors or from reading a sign advertising lessons.

Ben Lulu testified that he announced to the entire group (including plaintiff) that ski lessons were available. He encouraged all beginners as well as those who felt they needed a lesson to take one. As Ben Lulu was lining up for a lesson, he asked plaintiff, Leichter, and Shopft if they were going to join him. Plaintiff responded they were not going to take a lesson but would go "straight to the slopes." Plaintiff impeached Ben Lulu's trial testimony with a written statement he gave about the accident seven months after the events had occurred. In the statement, Ben Lulu made no mention of: (1) having seen plaintiff and her friends on their way to the ski lift; (2) having spoken to plaintiff at that time; or (3) having suggested to plaintiff that she take ski lessons.

Defendant's theory was that it had acted reasonably in regard to the trip. To supplement Ben Lulu's testimony, defendant presented an expert witness. That individual opined that approximately 80 percent of first time skiers do not take lessons; that it was reasonable for defendant to permit first-time skiers on the slopes without requiring them to take lessons; and that it was reasonable for defendant to rely upon Snow Valley to warn skiers as to what was necessary before going on the slopes.

The jury returned a series of special verdicts. It first found that defendant had been negligent; that defendant's negligence was a cause of plaintiff's injury; and that plaintiff's damages were $1.2 million. The jury then found that plaintiff had been negligent; that her negligence was a cause of her injury; and that her negligence constituted 50 percent of the cause of her injury. Plaintiff was therefore awarded $600,000 plus costs and interest.

## DISCUSSION

### A. *The Failure to Submit BAJI No. 2.22 Was Not Prejudicial Error*

Defendant first contends that the trial court committed prejudicial error when it refused to submit BAJI No. 2.22 to the jury. The instruction

reads: "A witness false in one part of his or her testimony is to be distrusted in others. You may reject the entire testimony of a witness who willfully has testified falsely on a material point, unless, from all the evidence, you believe that the probability of truth favors his or her testimony in other particulars."

At the close of trial, defense counsel requested the instruction because plaintiff and Leichter had given contradictory testimony as to whether ski lessons had been offered to plaintiff. The court denied the request, finding: "I don't believe this is a willfully false situation. It's simply the recollection of the parties, so [BAJI No. 2.22 is] refused." On this appeal, plaintiff does not defend that ruling; instead, she urges any error which may have occurred was nonprejudicial. She is correct.

■ "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.] Of course, that determination depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury. [¶] But the analysis cannot stop there. Actual prejudice must be assessed in the context of the individual trial record. . . . Thus, when deciding whether an error in instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 580-581 [34 Cal.Rptr.2d 607, 882 P.2d 298], fn. omitted.)

■ Defendant claims the court's refusal to submit BAJI No. 2.22 precluded it from arguing to the jury that were it to find that plaintiff had been willfully false in one aspect of her testimony (notice about the availability of ski lessons), it could disregard all of her testimony. We disagree. In closing argument, defense counsel addressed the conflict in the testimony in the following manner:

"Think back to the very first witness called by plaintiff's lawyer, Tova Leichter. Plaintiff's lawyer had met with Tova before she testified here, and he told her how he wanted her to answer certain questions. In fact, he told her to answer 'no' when Tova wanted to answer, 'I don't know,' when Tova knew the true answer was, 'I don't know.' That was in regard to whether Golan [Ben Lulu] had made the announcement of whether lessons were available. Tova told you, during my cross-examination, about her meeting with plaintiff's lawyer and how he told her to say 'no' when she wanted to say, 'I don't know.' When I was finished with my cross-examination,

plaintiff's lawyer didn't get up and have Tova explain that this was just a misunderstanding between him and her. He couldn't do that because it wasn't a misunderstanding. What it was was an attempt to shape Tova's testimony to strengthen plaintiff's case. Why did he do that? Because he didn't like the truth. He didn't like Tova's version of what happened at Snow Valley on February 15, 1993. Plaintiff's lawyer doesn't want you to believe that plaintiff knew lessons were available and that she made her own decision not to take those lessons.

"Now let's look at what Tova actually did say here in court under penalty of perjury. One, she said in no uncertain terms that she and plaintiff were slipping and sliding before they even reached the bottom of the bunny slope. Two, Tova testified that she and plaintiff knew lessons were available for free. [Three,] Tova testified that she and plaintiff saw a sign saying lessons were available and that they were starting in only a half-hour. Four, Tova testified that she and plaintiff made a conscious choice not to take the lesson because they didn't want to wait.

"This proves that plaintiff knew you could slip and you could fall on skis. This proves that plaintiff knew ski lessons were available to her without charge, and in just a half-hour. This proves that it was plaintiff's own decision to not take lessons.

"*Plaintiff, on the other hand, testified that she did not know lessons were available. She admits that she was with Tova the entire time she was at Snow Valley before the accident, but she denies that she knew lessons were available. This is in direct contradiction to Tova's testimony. Their stories are opposite. You can't believe both, and I suggest Tova should be believed.*

"Tova was called as a witness by plaintiff's lawyer. Tova has absolutely nothing to gain from this suit, nothing. She has no reason to lie. She hasn't even seen plaintiff since they last met [last summer] at B'Nei Akiva, the camp where plaintiff's brother was after the accident.

"Plaintiff, on the other hand—well, plaintiff and her lawyer want to make a lot of money in this case and they'll do whatever it takes. Now I realize those are hard words. They have serious consequences, and I don't make these statements lightly, but that conclusion is inescapable when you compare Tova's testimony with that of the plaintiff." (Italics added.)

It is therefore apparent that defendant, contrary to what it now suggests, squarely addressed the material discrepancies between the testimony of plaintiff and Leichter and pointed out that the direct conflict between the two

required the jury to decide which of the two to believe. In that context, defense counsel forcefully argued that Leichter was the more believable because she had no motive to fabricate whereas plaintiff had a financial stake in the outcome of the litigation. Given this argument, if the jury believed plaintiff was intentionally lying about the material issue of being informed about the lessons,[2] the jury could have exercised its common sense to reject all of plaintiff's testimony even without the submission of BAJI No. 2.22.[3] ■ "[This] instruction . . . belongs to that class of instructions which are said to pertain to mere commonplace matters that jurors are presumed to know about and act upon in the absence of being instructed thereon." (*Medlin* v. *Spazier* (1913) 23 Cal.App. 242, 246 [137 P. 1078].) The rationale is clear: "It should certainly not be deemed of vital importance to tell the ordinary man of the world that he should distrust the statements of a witness whom he believes to be a liar." (*Reynolds* v. *E. Clemens Horst Co.* (1917) 35 Cal.App. 711, 719 [170 P. 1082].) Or stated another way: "[The instruction] merely means what any person of common judgment would know without judicial instruction, that it is the part of wisdom and a duty on the part of jurors to carefully scrutinize with distrust or suspicion the entire testimony of a witness who has wilfully perjured [her]self regarding a material fact in the case." (*People* v. *Kennedy* (1937) 21 Cal.App.2d 185, 201 [69 P.2d 224].)

■ Our recent opinion in *People* v. *Murillo* (1996) 47 Cal.App.4th 1104 [55 Cal.Rptr.2d 21] supports our conclusion that the error was nonprejudicial. There, the trial court agreed to submit the criminal version of this instruction (CALJIC No. 2.21.2) based upon inconsistencies in the victim's testimony identifying the defendant as the robber. Defense counsel then presented argument utilizing that instruction. However, through inadvertence, the trial court neglected to submit the instruction to the jury. On

---

[2]Defendant argues that its ability to make this argument was undercut by the submission of BAJI No. 2.21. That instruction reads: "Discrepancies in a witness's testimony or between such witness's testimony and that of other witnesses, if there were any, do not necessarily mean that such witness should be discredited. Failure of recollection is common. Innocent misrecollection is not uncommon. Two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to an important matter or only to something trivial should be considered by you."

Defendant now claims: "The 'innocent' explanation for testimonial conflicts was given undue emphasis, and there was no counterbalance to be applied where conflicts in testimony result, not from innocence, but from deliberate falsity. The prejudice to defendant was palpable." We disagree in light of the fact that defense counsel forcefully argued that plaintiff had a motive to fabricate whereas Leichter had no reason to lie.

[3]In this light, we note that the trial court did submit BAJI No. 2.20, "Believability of Witness," which lists factors the jury can consider in evaluating the credibility of a witness. One factor listed is: "The existence or nonexistence of any fact testified to by the witness." This factor clearly embraces the case at bench, the fact being whether or not plaintiff was told lessons were available.

appeal, the defendant contended this error was prejudicial. We disagreed, in an analysis also pertinent to this case. "CALJIC No. 2.21.2 sets out a commonsense principle for evaluating witness credibility. Defense counsel argued that principle as much as she argued the instruction, and the jury simply did not accept her characterization of [the victim's] testimony. '[T]he absence of the instruction did not preclude [defendant] from asking the jury to draw the common-sense inference mentioned in the instruction.' [Citation.] If the jury had agreed with defense counsel that [the victim] was consciously lying on the stand, it would have been able to reach the conclusion that 'his testimony [was] to be distrusted,' even without the instruction's guidance." (*People* v. *Murillo, supra,* 47 Cal.App.4th at p. 1108.)

Defendant attempts to avoid the force of this conclusion by arguing: "The prejudice to defendant caused by the failure to give this instruction was especially acute because *the jury necessarily found that part of plaintiff's testimony was not truthful.* Had the jury been properly instructed, it could have found that other parts—or even the entirety of her testimony—also were not truthful." (Italics added.) Defendant claims the jury must have found plaintiff to be untruthful because it found plaintiff to be 50 percent at fault. Defendant argues: "In finding that plaintiff was contributorily negligent, the jury *necessarily* disbelieved that portion of her testimony asserting she did not know about the availability of ski lessons. This is so because the *only* evidence of plaintiff's contributory negligence was that she knew she could take a lesson but chose not to—a conclusion directly contrary to her own testimony." (Italics in original.) This claim does not withstand scrutiny because there were other bases upon which the jury could have found plaintiff to have been at fault. That is, the jury could have found that plaintiff told the truth about not having been told about the availability of ski lessons but that she nonetheless failed to exercise due care on her part because, after falling down several times while attempting merely to walk on the skis, she continued to press forward when a reasonable person in her position either would have taken off the skis and/or inquired about the availability of lessons.[4]

Furthermore, even were we to assume that the jury's finding of comparative fault indicates its disbelief of plaintiff's testimony on the issue of being

[4]For instance, during closing argument defense counsel stated: "Finally, remember that it was plaintiff who decided not to wait for lessons. It was plaintiff who decided to take the risk on the slope. Plaintiff knew her own skill level better than anyone. Plaintiff knew better than anyone what a difficult time she had getting to the lift. Was plaintiff unreasonable in that decision? I ask you to consider that in your deliberations, and I ask you to return a decision in favor of [defendant]."

In a similar vein, we note that a finding that plaintiff was contributorily negligent for continuing to stay on the skis would be consistent with the testimony of her own expert that

told about ski lessons (see *Maupin* v. *Widling* (1987) 192 Cal.App.3d 568, 573 [237 Cal.Rptr. 521]), that does not mean that defendant was prejudiced by the failure to instruct with BAJI No. 2.22. We disagree with the premise of defendant's argument, to wit, that the only way the jury could have found it to have been negligent was if it found Ben Lulu did not tell her about lessons. Plaintiff, from the outset of the case, posited various ways in which defendant had been negligent. One such way was that defendant failed to take steps *to require* all first-time skiers to take lessons.[5] Thus, it is possible that the jury disbelieved plaintiff, found she had been told about the lessons and consequently was contributorily negligent in not taking a lesson but that defendant was nonetheless still negligent because it failed to take the additional step of preventing her (as well as all other first time skiers) from skiing unless and until a lesson had been completed.

In sum, the omission of BAJI No. 2.22 does not constitute prejudicial error on the facts of this case. Defense counsel was still able to argue the essence of this commonsense instruction. The jury's finding of comparative (50 percent) fault simply does not have the significance defendant seeks to give it. There is no reasonable probability that had BAJI No. 2.22 been submitted, the jury would have reached a different verdict.[6]

---

"she did nothing to contribute to her accident, aside from the fact that she was on the ski slope where she shouldn't have been."

[5]Plaintiff's expert found multiple faults with the manner in which Ben Lulu had supervised the trip. In particular, he opined that if plaintiff had refused to take a lesson after being informed of its availability and value, "then that's the point where he [Ben Lulu] should have put his foot down, so to speak, and said no, I don't authorize you to go on the lift. I don't authorize you to go on the slope. You're not permitted up there until you've had an instruction on how to ride the lift, how to get on, how to get off, how to stop, and even if in case you fall, how to fall safely. All that should have been a decision that he should have made, and he should have been firm about it, and he should have enforced it."

Plaintiff's counsel elaborated on this point in closing argument. He urged: "[Ben Lulu] should have insured that all the youth knew lessons were available, that they were free, *and most importantly, that they were mandatory for first time skiers, and that no youth was authorized to use the lift or go on a slope until they took a lesson or were okayed by a ski instructor, and he should not have left lessons as an option for youth to decide if in fact he bought the lessons and told them about it.* Safety is not an option." (Italics added.)

[6]Because a finding of prejudice is necessarily a fact-driven inquiry based upon the particular record in each case, defendant errs in placing such great reliance upon *Estate of Ross* (1919) 179 Cal. 629 [178 P. 510] in which our Supreme Court concluded that *in that particular case* the failure to deliver the "wilfully false" instruction was prejudicial error. In that case, the dispositive question was whether the testator was of sound mind when he executed his will. The court found prejudicial error because: (1) the witnesses' testimony "radically differed upon the all-important question" (*id.* at p. 632) and (2) the testimony of his attending nurse on this question was contradicted by a prior inconsistent written statement given by her (*id.* at pp. 632-633 & 630-631). Other than that terse analysis, the opinion does not recite with particularity either the evidence offered at trial or the arguments given by counsel relevant to the claim of error. Thus, the case merely: (1) stands for the proposition

## B. *BAJI No. 14.12 Was Properly Submitted*

■ Defendant's other contention centers upon the trial court's submission, over its objection, of BAJI No. 14.12. The instruction explained that the damages that could be awarded to plaintiff included "[t]he present cash value of earning capacity reasonably certain to be lost in the future as a result of the injury in question." Defendant argues the instruction should not have been submitted because "there was no evidence from which the jury could determine that plaintiff had suffered any loss of future earning capacity, let alone evidence that would permit the jury to quantify that loss." We disagree.

■ "With respect to loss of future earnings, the decisional law and other authorities carefully point out that '[l]oss of earning power is an element of general damages which can be inferred from the nature of the injury, *without proof of actual earnings or income either before or after the injury,* and damages in this respect are awarded for the loss of ability thereafter to earn money.' [Citations.]

" 'One's earning capacity is not a matter of actual earnings. The impairment of the power to work is an injury wholly apart from any pecuniary benefit the exercise of such power may bring and if the injury has lessened this power, the plaintiff is entitled to recover. . . . In short, the test is not what the plaintiff would have earned, but what [s]he could have earned.' (Stein, Damages and Recovery—Personal Injury and Death Actions (1972) § 58, p. 94.) *The important distinction just discussed is particularly applicable when the plaintiff is a student or an apprentice.* (See Stein, *supra,* § 84, p. 131; and Johns, Cal. Damages—Law and Proof (2d ed. 1977) § 1.29, pp. 48-49.)

"The decisional law in California has long applied the above stated rule. [Citations.] In these decisions, the courts sanctioned recovery by the plaintiffs of damages for impairment of future earning capacity. . . ." (*Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 656-657 [151 Cal.Rptr. 399], second italics added.)

■ Contrary to defendant's claim, there is no requirement that expert testimony about future earning capacity be presented before the jury is entitled to determine compensation for loss of future earnings. *Lang v. Barry* (1945) 71 Cal.App.2d 121 [161 P.2d 949] is illustrative. At the time of the accident, the plaintiff was a 16-year-old part-time gas station attendant. (*Id.*

that refusal to give the "willfully false" instruction *can* result in reversal *if* prejudice is shown and (2) illustrates one situation in which the appellants succeeded in making that showing.

at p. 123.) He presented expert testimony from his physician about the nature and extent of his injuries. Evidence was also presented that the injury disqualified the plaintiff from regular military service and that he "had been accepted only for limited service as a specialist." (*Id.* at p. 126.) The jury rendered a verdict in the plaintiff's favor. On appeal, the defendant contended that the court erred in instructing the jury that it could consider the permanence of the plaintiff's injuries in determining damages. The appellate court rejected the contention. It first found the plaintiff's evidence supported submitting to the jury the issue of the permanence of the injuries. Then, in language applicable to this case, it held: "The permanent weakness of the left leg having been shown, impairment of the minor plaintiff's earning power could properly be considered by the jury, being within the knowledge and observation of the jury as persons of ordinary intelligence and experience. [Citations.]" (*Id.* at pp. 126-127.)

Defendant's argument that this holding has been overruled sub silentio by two subsequent decisions from the California Supreme Court lacks merit. The first case cited by defendant is *Connolly* v. *Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483 [319 P.2d 343]. There, at the time of accident, the plaintiff was a 20-year-old champion tennis player who was forced to abandon that pursuit because of injuries caused by the defendants. (*Id.* at p. 488.) At trial, the plaintiff presented several expert witnesses as to what she would have earned had she pursued a professional tennis career. (*Id.* at pp. 488-489.) On appeal, the defense claimed the award of damages was excessive. The Supreme Court disagreed. It wrote: "Loss of earning power is an element of general damages which can be inferred from the nature of the injury, *without proof of actual earnings or income either before or after the injury*, and damages in this respect are awarded for the loss of ability thereafter to earn money. [Citations.] [¶] When consideration is given to all the circumstances, including the loss of earning power and the nature of the injury, we cannot say that the verdict is excessive." (*Id.* at p. 489, italics added.) Thus, defendant errs in claiming that *Connolly* established a rule that a plaintiff *must* present expert testimony about future earning capacity in order to recover compensation for loss of future earnings. To the contrary. The italicized portion of the court's holding indicates the vitality of the principle that such proof is not required. The mere fact that the plaintiff in that case presented such expert testimony does not change that conclusion.

The second case cited by defendant is *Markley* v. *Beagle* (1967) 66 Cal.2d 951 [59 Cal.Rptr. 809, 429 P.2d 129]. At the time of the accident the plaintiff serviced ventilation systems. (*Id.* at p. 955.) The plaintiff's medical expert testified about the plaintiff's loss of future earning capacity and the

plaintiff's counsel asked the jury to accept the expert's estimate. (*Id.* at p. 956.) (The opinion does not give the details of the expert's testimony.) On appeal, the defense urged it was error for the jury to be led to believe that the expert's estimate of future loss of earning capacity was precise evidence. The Supreme Court disagreed, simply holding that "[t]he expert's estimate provided a reasonable basis for determining plaintiff's future loss of earning capacity . . . ." (*Id.* at p. 956.) Once again, nothing in this holding even begins to suggest that a plaintiff *must* present expert testimony on the issue. In sum, it is not necessary for a party to produce expert testimony on future earning ability (see *Castro* v. *Giacomazzi Bros.* (1949) 92 Cal.App.2d 39, 46 [206 P.2d 688], and *Girard* v. *Irvine* (1929) 97 Cal.App. 377, 385-386 [275 P. 840]) although some plaintiff's attorneys may choose as a matter of trial tactics to present such evidence. (See, e.g., *Rodriguez* v. *McDonnell Douglas Corp., supra,* 87 Cal.App.3d 626, 657-659, and *Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 461 [130 Cal.Rptr. 786].)

Coupling these principles with the evidence presented in the present case, we conclude the submission of BAJI No. 14.12 was not error. In regard to plaintiff's intent to pursue a career, plaintiff, who was 19 years old at the time of trial, testified she was enrolled in college, majoring in special education. She intended to go to graduate school and pursue the field of special education, working with mentally retarded or physically challenged preschool children. As for the effect of the injury to her knee, her doctor testified that plaintiff would have to avoid activity such as twisting and turning that could unduly stress her knees. Furthermore, plaintiff was at risk that at some time she would need a total knee replacement or fusion of her knees.

This evidence warranted the submission of BAJI No. 14.12. Plaintiff intended to pursue a career teaching young children with mental or physical disabilities, a career which by necessity would require physical dexterity and mobility. Plaintiff's knee injury as well as the possibility of future surgeries will impair her ability to effectively function in her chosen career. These physical restrictions create a reasonable inference that plaintiff's future earning capacity will be impaired. Plaintiff was not required to present expert testimony about the loss of future earnings. "Loss of earning power is an element of general damages that may be inferred from the nature of the injury, with or without proof of actual earnings or income either before or after the injury. [Citations.]" (*Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 412 [196 Cal.Rptr. 117].) In sum, the jury was properly instructed about loss of future earning capacity.

## Disposition

The judgment is affirmed.

Epstein, J., and Hastings, J., concurred.