Filed 6/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THYME LEWIS,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEKSANDR UKRAN et al.,<br><br>    Defendants and Appellants. | B290128<br><br>(Los Angeles County<br>Super. Ct. No. BC517320) |

        APPEAL from a judgment and order of the Superior Court of Los Angeles County, Lia V. Martin, Judge. Affirmed.

        Robie & Matthai, Kyle Kveton and Natalie A. Kouyoumdjian for Defendants and Appellants.

        Mardirossian & Associates, Inc., Garo Mardirossian, Armen Akaragian, Adam Feit; and The Ehrlich Law Firm, Jeffrey I. Ehrlich, and Clinton Ehrlich for Plaintiff and Respondent.

# INTRODUCTION

This case arises out of a van-versus-motorcycle accident between plaintiff and respondent Thyme Lewis and defendant and appellant Aleksandr Ukran.[1]  Following a bench trial, the trial judge found Ukran negligently caused the accident and awarded Lewis total damages of $1,651,702.39 for past medical expenses and past lost earnings, loss of future earning capacity, and future medical damages.  The court also awarded pre-judgment interest running from the date of Lewis's Code of Civil Procedure section 998[2] settlement offer.

Ukran moved for a new trial, arguing the damages award was excessive because: (1) it was not supported by sufficient evidence; and (2) damages awarded for future medical expenses and future lost earnings were not reduced to present cash value.  The trial court denied the motion.  Ukran appeals from both the final judgment and the order awarding pre-judgment interest.  We affirm.

We publish our opinion to resolve an open legal question: who bears what burden of proof when reducing an award of future damages to present value? Neither party points us to, and we have been unable to locate, a California case expressly addressing the issue.  The federal Circuit Courts of Appeals are split.  Because neither party in this case offered any evidence

---

[1] Ukran was driving the van in the course and scope of his employment for appellant Lov Gettogether, Inc. (LGI).  For ease of reference, we refer to Ukran and LGI collectively as Ukran.

[2] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

(expert or otherwise) concerning the appropriate discount rate, the trial court declined to perform a present value calculation.

We hold, in a contested case, a party (typically a defendant) seeking to reduce an award of future damages to present value bears the burden of proving an appropriate method of doing so, including an appropriate discount rate. A party (typically a plaintiff) who seeks an upward adjustment of a future damages award to account for inflation bears the burden of proving an appropriate method of doing so, including an appropriate inflation rate. This aligns the burdens of proof with the parties' respective economic interests. A trier of fact should not reduce damages to present value, or adjust for inflation, absent such evidence or a stipulation of the parties.


## FACTUAL AND PROCEDURAL BACKGROUND

We state the facts in the manner most favorable to the judgment. (*Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 492, fn. 1.) Given Ukran's contentions on appeal, our recitation of the circumstances of Lewis's injury can be brief.

On March 26, 2013, Ukran was driving his van and made a sharp left turn directly into Lewis's path of travel. Lewis braked hard, but the front tire of his motorcycle collided with the side of Ukran's van. Lewis flew off his motorcycle and landed on the van's roof, thereby sustaining major injuries to many parts of his body.

Lewis filed a complaint for negligence against Ukran. Seven months later, Lewis served Ukran with a section 998 offer

to settle his claims for $950,000. Ukran did not accept the offer and a bench trial commenced.

Lewis was 51-years-old at the time of trial. He testified he worked in the entertainment industry as an actor, including a six-year stint on the TV show "Days of Our Lives," and played on celebrity basketball and baseball teams. In 2009, Lewis began doing stunt-related training. Within the three years before the accident, Lewis did approximately thirty jobs involving choreographed fight scenes and stunt driving. Lewis testified he was unable to perform the stunt jobs he had lined up for 2013 because of the injuries he suffered in the crash, causing him to lose $40,000 in earnings. He attempted shooting a Mercedes commercial about six months after the accident, but his physical limitations made the driving very taxing, causing him to miss his mark and break the left headlight of the Mercedes. Another stuntman replaced Lewis to finish the shot. Lewis further testified he felt he had the ability to continue working as a stuntman for 15 years had the accident not occurred and estimated he would have earned between $4.5 and $7 million. Many of the people he was working with as he moved up the ranks were earning between $300,000 and $400,000 per year.

Lewis also called Thomas McComas, a stuntman, director, and stunt coordinator[3] with 20 years of experience, to testify about Lewis's future earning capacity. McComas opined that Lewis, who is African American, "matched perfectly to being a stunt performer" given the new push for diversity in television and film. McComas testified Lewis could be working on commercials that would each pay him between $30,000 and

---

[3] As a stunt coordinator, McComas figures out the logistics of the stunt, including the budget for the stunt and the people to hire.

4

$50,000. And someone of Lewis's "skill level and ethnicity" would earn between $200,000 and $300,000 per year on average, though $500,000 per year "is definitely not an unattainable number." He further testified that, because Lewis looks younger than he is, "there's no reason that he couldn't work until his mid-60s."

Following trial, the court issued and filed its Order for Judgment and its Statement of Decision. The court found Ukran, while in the course and scope of his employment at LGI, was negligent and his negligence was a substantial factor in causing harm to Lewis. It also awarded $1,651,702.39 to Lewis, which consisted of a stipulated amount of $107,002.39 for Lewis's past medical damages and $40,000 in past lost earnings, $1,200,000 for lost earning capacity, and $304,700 for future medical damages. The court declined to reduce Lewis's future damages to present cash value, explaining "there was no evidence presented regarding how that calculation would properly be made." The court also awarded pre-judgment interest from the date Lewis served his section 998 offer under Civil Code section 3291.

Ukran moved for a new trial, contending Lewis's evidence was insufficient as a matter of law to support the court's award of lost earning capacity, and future damages should have been reduced to present cash value. The court denied the motion and this appeal followed.

## DISCUSSION

### I.    Damages for Lost Earning Capacity

Ukran contends the court's damages award for lost earning capacity was excessive and not supported by sufficient evidence. We disagree.

5

## A. Legal Principles and Standard of Review

When reviewing whether a trial court's damages award is excessive and whether a trial court erred in denying a motion for new trial, we employ the substantial evidence standard. (*Major v. Western Home Insurance Co.* (2009) 169 Cal.App.4th 1197, 1213.)

Loss of earning capacity damages are closely related to loss of future earnings damages in that they both compensate plaintiff for earnings the plaintiff would have received in the future but for the injury. Loss of earning capacity is simply a broader way of compensating for future earnings loss. (Haning et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2018) ¶ 3:582, p. 3-103.) Loss of earning capacity refers to the extent to which the injury interferes with plaintiff's ability to draw higher earnings in the future by advancing to a better paying position or an alternative career. *Id*. at ¶3:496, pp. 3-91-92, ¶3:582, p. 3-103; *see also Connolly v. Pre-Mixed Concrete Co.* (1957) 49 Cal. 2d.483, 488–489 [loss of earning capacity damages awarded to a "champion tennis player" who had won the National Singles Title three times, won the "four major championships of the world" and been offered a professional tennis tour; permissible to look to salary for professional tennis players].

More specifically, loss of earning capacity is "the difference between what the plaintiff's earning capacity was *before* her injury and what it is *after* the injury." (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 893 (*Licudine* I).) "[T]he focus is not on what the plaintiff *would* have earned in the future, but on what she *could* have earned." (*Ibid*. [internal quotations omitted].) Thus, "proof of the plaintiff's prior earnings, while relevant to demonstrate earning capacity, is not a

6

prerequisite to the award of these damages [citations]." (*Ibid*.) Once the factfinder has determined which career options are reasonably probable for the plaintiff to achieve, it can value the earning capacity of that career in three ways: "(1) by the testimony of an expert witness; (2) by the testimony of lay witnesses, including the plaintiff; or (3) by proof of the plaintiff's prior earnings in that same career." (*Id*. at p. 897, citations omitted.)

### B. Substantial Evidence Supports the Judgment

The court awarded $1,200,000 for lost earning capacity, finding Lewis had the capacity to do stunt work for 12 years and to earn an average of $100,000 per year. Lewis presented his own testimony and the testimony of McComas to value his lost earning capacity. Lewis testified he had the ability to continue working as a stuntman for 15 years had the accident not occurred, and estimated he would have earned between $4.5 and $7 million. He based his estimate on his knowledge of what other people in the industry were making as they moved up the ranks (between $200,000 and $400,000 per year). McComas estimated Lewis would have made between $200,000 and $300,000 per year, although $500,000 per year was "not an unattainable number," and "there's no reason that he couldn't work until his mid-60s."

Ukran contends "the same infirmities" in the evidence exist here as in *Licudine I*. We are unpersuaded. In *Licudine I*, plaintiff was awarded $730,000 for claimed loss of earning capacity as an attorney because she had been admitted to, but had not yet attended, law school. (*Licudine I, supra,* 3 Cal.App.5th at pp. 889-890.) The trial court set aside the award,

stating "'there was no evidence whatsoever of the compensation earned by graduates of any law school, much less the law school plaintiff chose to attend, or compensation of any attorneys, no matter how experienced.'" (*Id*. at p. 890.) The court of appeal affirmed, holding plaintiff did not adduce any evidence to establish it was reasonably probable she could have obtained employment as an attorney or any evidence of the earnings of lawyers. (*Id*. at 887.) Plaintiff's evidence in *Licudine I* consisted only of her interest in a legal career and her letters of acceptance to law school. But here, Lewis had been in the stunt industry for four years before the accident, and Lewis and McComas testified to how much Lewis could earn as a stunt performer.

Ukran acknowledges "plaintiff offered limited testimony regarding his income and earnings" before the accident, but claims the damages award is excessive because Lewis's actual earnings were significantly below $100,000 per year and Lewis offered no admissible evidence demonstrating specific guaranteed jobs he lost after the accident. We reject this argument for two reasons. First, the focus in determining loss of earning capacity is what Lewis *could* have earned in the future, not what he earned in the past. (*Licudine I, supra,* 3 Cal.App.5th at p. 893.) Second, there is evidence in the record of how much Lewis would have earned on certain jobs: Lewis would have earned approximately $20,000 for two-weeks of work on "Streets of Fury" and he earned $50,000 working on a Mercedes commercial after he was injured (despite needing to be replaced for one of the shots in the commercial).

Ukran also challenges the court's finding Lewis had the capacity to do stunt work for 12 years absent his injuries. The court found it was "overly optimistic to believe that Mr. Lewis

had the capacity to do this work for a full 15 years . . . . [but] it is reasonable to believe he could have performed all levels of stunt work for 12 years." Ukran contends Lewis offered no credible expert testimony with respect to his anticipated life expectancy in the entertainment industry as an actor, stuntman or precision driver and points to McComas's testimony that the movie industry is rapidly changing. It is not our role to reweigh the evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) And, contrary to Ukran's contentions, expert testimony is not vital to a claim for loss of earning capacity. (*Gargir v. B'Nei Akiva* (1998) 66 Cal.App.4th 1269, 1282 ["it is not necessary for a party to produce expert testimony on future earning ability . . ."].)

Finally, Ukran contends the court erred in characterizing Lewis's future earnings claim as "loss of earning capacity." Without citation to authority, Ukran argues Lewis's claim was "truly a claim for loss of future earnings" because he was "already in the industry" and thus, Plaintiff "needed hard, baseline historical income evidence to support his future earnings loss claim." We reject this contention. As the *Licudine I* court explained, "[i]n cases where the plaintiff is already part of the work force, courts have looked to the plaintiff's earning capacity in his or her chosen career." (*Licudine I*, 3 Cal.App.5th at p. 896.) Such is the case here. That Lewis worked as a stuntman for a few years before the accident did not preclude him from seeking damages for loss of earning capacity; instead, it "more than sufficed to show a reasonable probability that he could have been fit for that very same career in the future." (*Ibid*.) Accordingly, we conclude substantial evidence supported the judgment.

9

## II. The Court Did Not Err By Declining to Reduce Future Damages to Present Cash Value

"The present value of a gross award of future damages is that sum of money prudently invested at the time of judgment which will return, over the period the future damages are incurred, the gross amount of the award. [Citations.] 'The concept of present value recognizes that money received after a given period is worth less than the same amount received today. This is . . . because money received today can be used to generate additional value in the interim.'" (*Holt v. Regents of the University of California* (1999) 73 Cal.App.4th 871, 878.) Different approaches may be used to determine the present value of a lump sum future damages award.[4] Each calculation requires the input of a discount rate and an inflation rate (i.e. a rate that recognizes dollars in the future will buy less than would those same dollars if received today). These rates vary over time and are the subject of reasonable differences of opinion.

Ukran contends the court erred by not reducing the amount of future medical expenses and future lost earnings awarded to

---

[4] These approaches include calculating the difference between the market rate of interest and the anticipated rate of inflation, and then discounting by this "real interest rate"; including the effects of inflation in the gross award and then discounting by the market interest rate; or employing a zero discount rate (the "total offset approach"), if stipulated by the parties or supported by competent evidence on the inflationary and market interest factors. (Haning et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2018) ¶ 3:527, p. 3-96.)

present cash value. He claims the trial court was required to do so even in the absence any evidence proffered by any party of appropriate discount or inflation rates, or the appropriate method of calculating present cash value.

But the only California case Ukran cites for this position is *Scognamillo v. Herrick* (2003) 106 Cal.App.4th 1139, a case decided by a different panel of this Division. In *Scognamillo*, defendants' insurer failed to answer the complaint in an automobile accident case within the allotted time period. The trial court ultimately entered a default judgment in favor of the plaintiff and denied defendants' later motion to vacate. On appeal, the judgment was affirmed in part, but reversed with respect to two components of the damages award. The first consisted of the cost of a possible second surgery, and potential lost income while recuperating from it. The panel concluded the need for a second surgery "was entirely speculative" because the first planned surgery might well resolve plaintiff's back injury. The second consisted of the anticipated cost of the first back surgery, and the future wages expected to be lost as a result of it. The panel noted, "the trial court apparently did not reduce to present cash value the award for future lost wages for the first surgery, as it should have done. (*Niles v. City of San Rafael* (1974) 42 Cal.App.3d 230, 241-242.) In light of these circumstances, we will reverse the judgment and remand the matter to the superior court for reconsideration of the amount of damages to be awarded." (*Id.* at p. 1151.) The panel directed the trial court to reduce the award of future damages to present value. (*Ibid.*) Because defendants defaulted, the panel also directed that they not be permitted to participate in the proceedings on remand. (*Ibid.*)

11

Ukran assumes the *Scognamillo* panel expected the trial court, on remand, to reduce the future damages to present value without taking any evidence of how to do so. But the panel's citation to *Niles* shows otherwise. In *Niles*, the appellant challenged an inflationary rate as too high, and a discount rate as too low, used by respondent's trial expert to calculate damages for future medical and other expenses. The *Niles* court discussed this testimony at some length, concluding, "[t]he determination of damages is primarily a factual matter on which the inevitable wide differences of opinion do not call for the intervention of appellate courts," and the expert testimony constituted substantial evidence in support of the verdict. (*Niles, supra,* 42 Cal.App.3d at pp. 241-244.) Implicit in the *Scognamillo* panel's remand is an expectation that the trial court, in reducing the award of future damages, would require the plaintiff (as the only party participating in the proceeding) to offer evidence proving up the discounted cash value of the future damages award.

Alternatively, the trial court in a default case might take judicial notice of an appropriate discount rate. To the extent *Scognamillo* can be read to require a trial court to reduce a damages award to present value without appropriate evidence of how to perform that calculation, including the appropriate discount rate, we disapprove of it.

Our review of California case law reveals no definitive pronouncement regarding which party bears the burden of proof concerning appropriate discount and inflation rates in contested cases. The parties have not directed us to controlling authority. Moreover, the federal courts are in conflict on the issue. For example, the Ninth Circuit held the defendant has the burden of producing evidence of the discount rate and plaintiff has the

12

burden of producing evidence of inflation. (*Alma v. Manufacturers Hanover Trust Co.* (9th Cir. 1982) 684 F.2d 622, 626.)  However, if "neither party provides competent evidence of the inflation rate or the discount rate, the district court must make a lump sum award that is not adjusted for either factor." (*Ibid.*)  In arriving at this conclusion, the Ninth Circuit explained "[t]he rate is an evidentiary issue, and thus it is the responsibility of the parties to produce evidence of the rate that is appropriate." (*Ibid.*)

In *Miller v. Union P.R. Co.* (10th Cir. 1990) 900 F.2d 223, 226, the Tenth Circuit, relying on *Alma*, held the court did not err in refusing to give a reduction to present value jury instruction in the absence of any evidence concerning discounting methods.[5]  The Third Circuit, however, places the burden of producing evidence regarding a rational reduction to present value on the plaintiff. *See, e.g., Gorniak v. National R.R. Passenger Corp.* (3d Cir. 1989) 889 F.2d 481.

---

[5] The Tenth Circuit explained it did not believe its holding was "affected by *Monessen S. Ry. V. Morgan*, 486 U.S. 330, 100 L. Ed. 2d 349, 108 S. Ct. 1837 (1988), which held that a state trial court erred in a [Federal Employers Liability Act] case when it refused on the basis of a state rule to allow an award of future damages to be reduced to present value." (*Miller, supra*, 900 F.2d at p. 226, fn. 1.)  It acknowledged, however, that the Fourth Circuit in *Aldridge v. Baltimore and O.R.R.*, 866 F.2d 111 (4th Cir. 1989) (en banc) "apparently conclude[ed] that *Monessen* requires reduction in all cases." (*Ibid.*)  In *Monessen*, the Supreme Court reversed a decision after the trial judge told the jury it *could not* discount its damage award to present value.  We agree with the Tenth Circuit that *Monessen* does not address whether an evidentiary foundation must be laid to support the giving of a present value instruction.

We find the reasoning of the Ninth Circuit persuasive. Placing the burden on defendant to present evidence of the discount rate is also consistent with the Directions for Use to CACI 3904A: "It would appear that because reduction to present value benefits the defendant, the defendant bears the burden of proof on the discount rate." Therefore, we hold a defendant seeking reduction to present value of a sum awarded for future damages has the burden of presenting expert evidence of an appropriate present value calculation, including the appropriate discount rate, to enable the fact finder to make a rational determination on the issue. In the present case, because Ukran failed to introduce such evidence, the trial court correctly declined to adjust the future damages award.[6] The trial judge is not obligated, sua sponte, to determine an appropriate discount rate or method without evidence, and should not do so.

## III. The Court Did Not Abuse Its Discretion By Awarding Prejudgment Interest

Civil Code section 3291 states, in relevant part: "If the plaintiff makes an offer pursuant to Section 998 of the Code of

---

[6] Although the issue is not raised directly by the parties, we also agree with the Ninth Circuit's conclusion that a plaintiff seeking to increase an award of future damages because of inflation bears the burden of proving a reasonable inflation rate. Moreover, there is more to a present value calculation than discount and inflation rates. The court must make counter-factual assumptions about when the money awarded as damages would have been received; e.g., how much the plaintiff would have earned in each of some number of given years. This, too, requires evidence concerning the appropriate *method* of discounting the assumed future cash flow.

14

Civil Procedure which defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer . . . ."  Although Lewis obtained a more favorable award than his 998 offer, Ukran contends the trial court erred in awarding pre-judgment interest because Lewis's offer was not made in good faith (i.e. the offer was not valid). Whether a section 998 offer was reasonable and in good faith lies within the discretion of the trial court and is reversible only if we find an abuse of discretion. (*Calvo Fisher & Jacob LLP v. Lujan* (2015) 234 Cal.App.4th 608, 629.)

"A 998 offer is valid only if, among other things, the offeror knew that the offeree had reasonable access to the facts necessary to intelligently 'evaluate the offer.'" (*Licudine v. Cedars-Sinai Medical Center* (2019) 30 Cal.App.5th 918, 921.) Three factors are pertinent in making this determination: "(1) how far into the litigation the 998 offer was made; (2) the information available to the offeree prior to the 998 offer's expiration; and (3) whether the offeree let the offeror know it lacked sufficient information to evaluate the offer, and how the offeror responded." (*Ibid.*)  The offeree bears the burden of showing that a 998 offer was not made in good faith. (*Id.* at p. 927.)

The trial court found Lewis made the offer in good faith, concluding "Defendants had sufficient time to conduct an investigation of the facts of the case, and that Defendants' Form and Special Interrogatories do not address Plaintiff's lost earning capacity."  This finding is not the product of an abuse of discretion. Lewis served Ukran with a 998 offer in the amount of

$950,000 almost seven months after filing his complaint. Ukran did not accept the offer prior to its expiration. Ukran argues he lacked sufficient information to assess whether Lewis's settlement offer was reasonable because Lewis "failed to meaningfully answer" Ukran's interrogatories regarding lost earnings. For example, in response to Form Interrogatory No. 8.8, which asked, in part, whether Lewis would lose income in the future as a result of the accident and, if so, to provide an estimate of the amount of lost income and how the amount would be calculated, Lewis answered in the affirmative but failed to provide an amount or a calculation. Further, Special Interrogatory No. 7 asked Lewis to state the amount of his loss of earnings claim and how that claim was calculated. Lewis responded he had to decline various stunt jobs because of his injuries and he was in the process of requesting documents demonstrating income lost from these missed opportunities. But Lewis served his responses to Ukran's interrogatories over four months before the 998 offer expired. Thus, although Lewis's responses to Ukran's interrogatories addressing lost earning capacity may have lacked detail, Ukran had adequate time to evaluate Lewis's offer. Ukran could have, but did not, meet-and-confer with Lewis, move to compel further responses, depose McComas, ask for more information, or request additional time to assess the 998 offer.

Ukran relies on *Najera v. Huerta* (2011) 191 Cal.App.4th 872, but it is factually inapposite. In that case, "the section 998 offer was served concurrently with the summons and complaint, [and] there were no special circumstances present to show that at that early (and time-critical) juncture in the case, defendant's counsel had access to information or a reasonable opportunity to

16

evaluate plaintiff's offer within the 30-day period." (*Id*. at p. 879.) As discussed above, Ukran had the opportunity to evaluate Lewis's offer, but failed to do so. Accordingly, the court did not abuse its discretion in granting Lewis's motion for prejudgment interest from the date of his 998 offer.

## DISPOSITION

The judgment and order are affirmed. Lewis is awarded his costs on appeal.

**CERTIFIED FOR PUBLICATION**

CURREY, J.

WE CONCUR:


WILLHITE, Acting P. J.


COLLINS, J.